## CHARLESTON

KERSEY v. KERSEY *et al.*

Submitted February 5, 1915.   Decided March 23, 1915.

TRUSTS—*Enforcement in Equity—Acquisition of Property.*
>      Where one obtains the legal title to property through the influence of a relation of confidence and trust, under such circumstances that he ought not in equity and good conscience to hold and enjoy the same as against the other party to the relation, equity will impress the property with a trust in favor of the latter.

(LYNCH, JUDGE, absent.)

Appeal from Circuit Court, Mercer County.

Suit by W. W. Kersey against J. L. Kersey and others. From decree for plaintiff, the defendant named appeals.

*Affirmed.*

*Sanders & Crockett* and *Russell S. Ritz,* for appellant.

*French & Easley* and *Harold A. Ritz,* for appellee.

ROBINSON, PRESIDENT:

By this suit two brothers are in contest over the ownership of a laundry.  The plaintiff says that the plant and business is

his. The defendant quite as insistently says that it belongs to him. Each denies that the other has any right. Yet the record plainly enough establishes that the claim of each is so broad as not to be just, and that the chancellor did not very far miss the mark of sound equity when he rendered a judgment herein not unlike the proverbial one of Solomon.

The object of the bill is to have the defendant enjoined from interfering with the plaintiff's possession and management of the property and business and to have the plaintiff declared to be the sole owner thereof. The defendant, claiming to be the sole owner of all the property and business, was proceeding to oust the plaintiff therefrom when the suit was instituted. The court has decreed to each a particular interest. The defendant has appealed.

It is essential that we state from the record only such of the facts as show the true relation of the parties to each other, and their relation to the property involved. This will disclose the meat of the case.

W. W. Kersey, the plaintiff, and one Bentley, as partners, several years ago built up a laundry business in Bluefield. Having acquired real estate and mortgaged the same, they found it essential to the promotion of the enterprise that they turn it into an incorporated company. Of the capital stock of fifteen thousand dollars, each took shares to the amount of five thousand. The remaining stock, amounting to five thousand dollars, was to be sold to others. . Three of these shares were sold to the defendant J. L. Kersey, who at that time was a justice of the peace at Bluefield. Other small amounts were placed here and there, until there remained twenty-three shares unsold in the treasury of the company. Friction arose between W. W. Kersey and Bentley. It developed into an effort on the part of each to get control of the corporation by buying sufficient additional stock, so as to oust the other from participation in the management. Discovering that Bentley was seeking to obtain control, W. W. Kersey sought the aid of his magistrate brother. Things were so managed by them through the aid of a third party that the remaining twenty-three shares as well as two of Bentley's shares passed into their control, being taken over in the name of J. L. Kersey. This gave them a majority of the stock. But it was Bentley's

turn next. Four shares of his stock as well as four shares of W. W. Kersey's stock had been pledged as collateral to a note in bank. When the note matured, Bentley brought about a sale of the collateral, so that a brother-in-law of his became the purchaser of the same. Bentley did this by keeping from W. W. Kersey the fact that the note had matured and that a sale of the collateral was pending. Prior to this, J. L. Kersey had removed from Bluefield to Hinton, where he was managing a hardware business. Again W. W. Kersey sought the advice and aid of his brother. Legal proceedings against the sale of the collateral were begun. J. L. Kersey came to Bluefield to assist his brother in regaining control of the business. He sought to purchase shares of the stock from other parties, but did not succeed far enough to regain control for his brother as against Bentley. Soon thereafter Bentley suddenly died. Later, J. L. Kersey succeeded in getting in from Bentley's brother-in-law the eight shares of stock which he had purchased at the sale of the same as collateral. Thus, again the laundry business was in complete control of the Kersey interests. By the death of Bentley the enterprise was freed from the friction that had previously existed between those interests and the Bentley interests. The Kersey stock prevailed, a new board of directors was elected, and the remaining Bentley interests were excluded from the management.

For several months thereafter W. W. Kersey continued the business. His brother, living at Hinton, rendered only such aid as his situation afforded. That he had become the adviser of his brother toward saving the enterprise from control by the Bentley interests, and the manager of the financial affairs tending to that end, plainly appears. But it quite as clearly appears, that he had been drawn into all this out of a desire to protect his brother and save the business to the latter as against the Bentley interests. Brotherly interest, rather than attractive financial investment, brought him into the matter. He was not a laundryman. At no time was he directly connected with this laundry business.

While J. L. Kersey was regaining control of the stock, he deemed it best to take from W. W. Kersey a transfer of the stock which the latter held. He states that his reason for this

was that he did not believe his brother competent to handle the financial affairs, and that in order properly to handle them, it was necessary for him to have the stock in his name. He says that his brother was leaving the stock certificates lying around where anyone could obtain them. So at the request of J. L. Kersey, his brother transferred to him forty shares, retaining only five. As the stock then stood, it was considered worthless in actual money value. Still J. L. Kersey executed his note to W. W. Kersey for a sum representing the stock. It is conceded that the understanding between the parties was that the note was not to be paid, that the stock was to be returned to W. W. Kersey if they were successful in making it valuable, and that in any event the note was to be destroyed. That J. L. Kersey held the forty shares of stock in trust for his brother can not be gainsaid. He took it over to aid the efforts into which he had been drawn for the protection of his brother, as well as to aid efforts which by reason of his having been drawn into the matter were now necessary for his own protection. In a sense he had become the partner of his brother. The primary object of that in the nature of a partnership between them was to protect W. W. Kersey from being ousted by the other interests and thus losing all efforts and money he had put in the business. Later their joint relation developed into one having for its object the saving of the efforts and money they had both put in on the former score. They were working together, for one another. The relation was one of mutual trust, confidence, and protection—one not unnatural for brothers.

Though the Kerseys obtained control of the laundry plant and business, large indebtedness secured by deed of trust liens was hanging over the same. This indebtedness for a time they carried. Later, the property was allowed to go to sale under the deeds of trust. It was bought on behalf of the Kerseys, as we decide from the record, though J. L. Kersey claims that it was purchased for himself, while W. W. Kersey claims that it was purchased wholly on his behalf. It was bought at a very advantageous figure. Indeed the Kerseys planned that the sale should come their way and succeeded well in that regard. All other interests were of course foreclosed by the sale. The purchase gave them the

property independent of all others, so that they might take a new start with much more hope of saving the efforts and money they had theretofore invested.· The title was taken in the name of Pollock, an officer of the bank which advanced the amount necessary to pay the purchase money. In other words, the title was held by Pollock as security for the loan. Writings in this behalf attested that when the money was fully paid, Pollock was to transfer the title to J. L. Kersey. The note for the loan was given in his name. It is upon this purchase in the name of J. L. Kersey and the giving of an obligation therefor in his name, that he bases his claim as sole owner of the property.

After the purchase of the property the laundry business was continued under the direct management of W. W. Kersey as before. J. L. Kersey continued in business at Hinton. Thus matters went on from the latter part of 1911 to the early part of 1913. The relation which had grown up between the parties in regard to the laundry, continued. The correspondence between them during this time shows the same brotherly desire to aid each other in making the business a success. At no time did J. L. Kersey say anything or assume any part that would lead W. W. Kersey to think that he claimed sole ownership, or that the latter was merely in the employment of the former. The business began to be successful, and W. W. Kersey from the proceeds thereof was meeting payments on the purchase money loan.

During the year 1913 some questions arose between the parties as to their respective interests. In a letter, W. W. Kersey said to his brother: "I also think that we should come to some understanding about the business and incorporate, as the shape things are in at present, might place me in an embarassing position, should anything happen to you financially or otherwise." Clearly we see that he had reference to the fact that title to the property was held by J. L. Kersey. In reply to this, J. L. Kersey said: "In regard to personal settlement, I think it is the thing to do, and will ask that you go over the plant and property and figure out the best way to arrange it and tell me your plans and I will come over next month and fix it up. I believe to incorporate new company would be safest and best way to do it and issue stock for each

one's interest.'' Here is a plain admission that W. W. Kersey had an interest in the ''plant and property''. Prior to the writing of these letters, J. L. Kersey, writing to his father about the purchase of the real estate at the sale under deeds of trust, said: ''Before the sale took place I made arrangements with Mr. Mann to put up the money to buy it in at sale, and allow us to pay his Bank $100.00 per month until we paid off the amount of money borrowed. I consider this real estate deal the only one that saved the business for us. * * * The purchase and terms of payments on the building was arranged entirely by me, and I know positively that through a plan that I carried into effect on day of sale of the building that we got it for $1300.00 less than it would have otherwise cost.'' In another connection, speaking of W. W. Kersey he says: ''Will has threatened several times the past 3 years while we were having financial troubles to desert the plant and leave the country, and through fear of this I have pledged all I had to finance and save the business and now when the storm is over, tell me I have no interest in it, and not so much as thank me for saving him, or his original investment, in which I had one half interest, which has been concealed to this day by Will.'' In this letter he also tells his father that in a recent meeting with his brother the latter had ''denied that there was ever any partnership existing,'' and had claimed to own the business as a whole.

· The parties made no adjustment of the matter. Things went on as before until the early part of 1914. Up to that time, W. W. Kersey out of the proceeds of the business had paid more than half of the note given for the purchase money. J. L. Kersey did not put his individual money into the purchase taken in his name. The business was paying off the purchase money loan. But now differences between the brothers caused a complete break of the mutual helpfulness that had existed between them during the troublous times of the laundry enterprise. Like men do, but as brothers never should, each became insistent in his claim and extended it further than was actually just, in resistance to the claim of the other. W. W. Kersey took the position that J. L. Kersey had simply been acting for him in every transaction, and

brought this suit to settle his title as sole owner of the property and business. Then it was that J. L. Kersey for the first time claimed to be the sole owner of the property and business. He meets the claim of the plaintiff by saying that he holds title to the property by his purchase at the sale, that he entered into no agreement to hold the title for the plaintiff, and that if there had been such verbal agreement in that regard as is alleged, the same is invalid under the statute of frauds. By the decree the court has virtually found the parties to have been partners in the purchase of the property and the business carried on subsequently thereto. On a basis of the stock held in the old company by each, which they set out to shield by the purchase of the property and a continuation of the business, the decree gives 40/79 to the plaintiff and 39/79 to the defendant. Though the plaintiff says he did not get his due proportion, he is content with the decree. The defendant, however, by this appeal continues his contention for the sole ownership of the property and business.

It is true that by the original bill the plaintiff sought to make a case upon the theory that by an express verbal agreement the defendant acted in the purchase of the property solely for the plaintiff. But by the amended bill the plaintiff sufficiently asks the court to decree him such interest as the case may entitle him to. The argument that this makes a new case is not tenable. The amended bill is in place. Such rights as the plaintiff has, may properly be decreed to him. The defendant submits that no agreement on his part to hold title for the plaintiff has been established, and that even if such agreement appeared, it is not enforceable under the statute of frauds, which has been pleaded. True it is, that the express agreement alleged in the original bill, that the defendant was to take and hold title to the property as a whole for the plaintiff, has not been established. If it had been established, and the case was merely based on that, with no such equity as we find appearing, it may be that the statute of frauds would apply. The rights of the plaintiff, however, present themselves to us in different phase from any based on an express agreement. Out of the facts and circumstances an implied trust arises in favor of the plaintiff. The statute of

frauds, relied on by the defendant, is not involved. It can have no application to such a trust as we find here.

That the defendant purchased and took title to the property and business in behalf of both himself and his brother, is clear. That he did it in furtherance of mutual protection against total loss upon their previous investment in the old company, is equally clear. The defendant evidently so recognized it all along, before the purchase and after. We have seen that in letters to his brother and to his father he considers that in the purchase of the property he acted for both. These letters prove how he understood the matter at the time he was purchasing and taking the title. Besides, the circumstances which led up to the purchase are of themselves sufficient to prove that the defendant could have had no other intention when he bought in the property and took title in his own name, than the carrying out of a plan impliedly agreed upon by him and his brother whereby they might mutually save themselves from the loss of their interests in the old company. There is not a circumstance to indicate that he intended otherwise. In view of his former readiness to come into this affair of the laundry, a business not in his line, and to act therein for the protection of his brother as against threatened ousting by strangers, we can not in reason accuse him of intention to practice the very same arts of ousting on his brother that he had sought to shield that brother from.

Out of the circumstances under which the property was purchased both of the parties were bound in reason and good faith to each other to intend that the purchase was made for their mutual advantage and protection. Each had an equity in the property before the sale. For a long time they had worked together to the end that their investments might be saved. Each had the right to believe that the other was still acting to the same end. Nothing had transpired to alter the relation. In confidential reliance on each other, one with ability to solve the financial difficulties and the other with ability to run the laundry business when the financial difficulties were solved, they were working together to the end that what each had put into the old company would be saved by a purchase of the plant and a continuation of the business by them. There is not an inference that either one of them

meant to deprive the other of the hope of such end at the time the purchase of the plant was made, nor for months thereafter. In the old affairs they had acted as partners for their mutual good. In the purchase and continuation of the business they were still so acting. Jointly they were holding on, continuing and building up their original equities therein. They were more than partners; they were brothers. The relationship between them was a confidential one—a trust.

When the defendant took title to the property he was a trustee for the plaintiff. His trusteeship extended over the property he purchased. It came within the scope of the object of their joint dealings together. Not only was he a trustee because of the relation to which we have referred above, but he held forty shares of the plaintiff's stock as trustee, for the very object of protecting it. We have seen that this stock came into his keeping merely as a trustee to hold and protect the same. He could not buy in the property for himself and thereby shield his own investment alone, when he had assumed by the transfer of his brother's stock to him to protect it also. He was still under that trust. Equity will not permit him to violate it. The fact dwelt upon in the argument that all the stock became valueless by the sale can not avail here. In one sense the stock did become valueless. In an equitable sense it did not. The purchase protected the investment, though the stock representing the investment lost its form.

Under the circumstances appearing herein the holdings in *Henderson* v. *Henrie*, 68 W. Va. 562, and similar cases, do not apply. We have not merely the taking of title by one on express verbal agreement to hold for another. This case involves an equity in the plaintiff—a trust clearly arising in his favor in the very property held by the defendant. Applicable here is the following: "If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he can not equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is

considered in equity as the beneficial owner." 1 Pomeroy's Equity Jurisprudence, (3rd ed.), sec. 155.

As we have said, the relation between the parties was not unlike that between partners. Impliedly there arose a sort of partnership agreement between the plaintiff and the defendant, the object of which we have already set forth. Within that object came the purchase of the property. The relation between the parties was such that the one could not act within the scope of the implied agreement or toward the end sought without acting for the other as well as himself. Where the purchase of certain real estate is within the object of a partnership, the partner who buys and takes title therefor in his own name does so for the partnership, even though he invests his own funds. Any other view would allow him to violate the fiduciary relation. If he does undertake so to violate it, "a court of equity imposes the trust so as to nullify the breach of confidence". 13 Harvard Law Review, 458. It is elementary that one partner must exercise scrupulous good faith toward the other in all matters within the scope of the partnership. That principle applies as well to other similar confidential relations.

The defendant has the legal title through the influence of confidence and trust. The parties were not dealing with each other at arm's length. The case is not simply one of the violation of a verbal agreement to hold title for another. In such case, equity follows the law. But this case involves a wholly independent equity. To allow the defendant to deny the plaintiff any interest in the property would be to sanction a fraud on the part of the former. It would convert a confidential relation into an implement of fraud. In no way will a court of equity countenance fraud. Upon the whole this case is determinable by the principle that where one obtains the legal title to property through the influence of a relation of confidence and trust, under such circumstances that he ought not in equity and good conscience to hold and enjoy the same as against the other party to the relation, equity will impress the property with a trust in favor of the latter. Perry on Trusts, sec. 166.

The case is so clearly within the infinite variety of justice which a court of equity administers that we have no doubt

as to the stability of the decree complained of on this appeal. It appears that the plaintiff was entitled to a larger interest than the decree gives him. But he does not complain, and we have no province in that particular. An order will be entered affirming the decree.

*Affirmed.*