# CHARLESTON.

BYRD L. BARBEE et al. v. SUSIE R. LYNCH et al.

Submitted November 13, 1917.    Decided May 7, 1918.

TRUSTS—Express Trust—Creation.

Where the owner of land, which is largely encumbered with liens, causes the title thereto to be conveyed to one of his sons upon the understanding that it shall be held for all of his children, and that they shall devote their energies to the task of saving the land from sale to satisfy the liens against it, and by the joint efforts and contributions of all of them the land is saved and becomes very valuable, because of the discovery of oil thereon, the son in whose name the legal title is will be held to be a trustee, holding the same for the common benefit, and in equity will be compelled to convey to his brothers and sisters their interest in said land, and to account to them for their share of the issues and profits derived therefrom.

(LYNCH, JUDGE, absent).

(WILLIAMS, JUDGE, dissenting).

Appeal from Circuit Court, Harrison County.

Suit by Byrd L. Barbee and others against Hiram Lynch, revived after defendant's death against Susie R. Lynch and others, his personal representatives and heirs at law. Decree for defendants, dismissing the bill, and plaintiffs appeal.

Reversed and remanded.

Simpson, Brown & Williams, and Geo. M. Hoffheimer, for appellants.

John W. Davis, Carter & Sheets, Swartz & Templeman, and Smith & Jackson, for appellees.

RITZ, JUDGE:

Plaintiffs instituted this suit against their brother Hiram Lynch for the purpose of having him declared to be a trustee holding the legal title to certain lands for the joint benefit of himself and the plaintiffs, for the purpose of having partition of said lands and an accounting of the issues and profits thereof. Pending the litigation Hiram Lynch died, and the cause was revived against his personal representative and

heirs-at-law. On a hearing in the court below plaintiffs were denied relief and their bill dismissed. This appeal is prosecuted to review that decree.

The plaintiffs and Hiram Lynch were the children of William B. Lynch who died in the year 1898. The tract of land involved formerly consisted of two adjoining tracts, one owned by the said William B. Lynch, and the other by his brother Wesley C. Lynch. The William B. Lynch farm it appears contained 322.52 acres, and the Wesley C. Lynch farm 243 acres. In the year 1879 Wesley C. Lynch determined to sell his farm and remove to the west. After some negotiations the title thereto was conveyed to Hiram Lynch. The consideration to be paid for this transfer was seven thousand dollars, of which two thousand dollars was paid in cash, and the principal of the residue never was paid until the development of the land hereinafter referred to. At that time William B. Lynch was living upon his farm with his family, including the said Hiram Lynch, and while it is denied by Hiram Lynch it is satisfactorily proven that as soon as this conveyance was made to Hiram Lynch the two farms were thrown together and treated as one farm, and the said William B. Lynch continued to reside thereon. It appears that there was a considerable indebtedness against the William B. Lynch land. In the year 1886 he executed a deed of trust conveying the land to a trustee to secure these debts. The indebtedness secured amounted to $13,310.00, and it seems that this was more than the land was worth. At that time Hiram Lynch was still living on the farm with his father and was unmarried. In the meantime his two sisters, the plaintiffs, had married and left home. It is stated by them that Hiram refused to further lend his efforts to saving the William B. Lynch farm unless it was foreclosed under the deed of trust, and the title put in his name with a lien thereon for a sum more nearly commensurate with its actual value. In 1887 the deed of trust was foreclosed, and the tract of land was purchased by the Merchants National Bank for the sum of $7800.00. This bank was one of the creditors secured by the deed of trust, but the amount realized at the sale did not satisfy its debt, it being practically all taken to pay prior debts. A

few days after the purchase and conveyance to the bank, it conveyed the tract of land to Hiram Lynch for the consideration of $9660.00. Of this sum $660.00 was paid in cash, and the other $9000.00 secured not only by a vendor's lien on this tract of land, but likewise by a deed of trust upon the tract of land conveyed to Hiram Lynch by Wesley C. Lynch in 1879. The money to pay the $660.00 cash payment was loaned by R. T. Lowndes, an officer of the bank. It appears that Lowndes loaned the sum of $4000.00 for the purpose of putting cattle on the farm and equipping it for farming purposes. $2000.00 of this was secured by a deed of trust on the land, and the other $2000.00 by a lien upon the cattle and other property purchased therewith. Out of this $4000.00 the $660.00 cash payment was made. Hiram Lynch lived on the land with his father, in the house where they had theretofore lived, until the death of his father in the year 1898. It is satisfactorily shown that after the plaintiffs had left home they were importuned by both Hiram Lynch and their father to save all the money they could in order that the interest and taxes on the lands might be paid, and the same saved from foreclosure. These plaintiffs testify, and their testimony is corroborated in many ways, that they did deny themselves many of the comforts and all of the luxuries of life during all of that time in order to accumulate small funds which they turned over to Hiram for the purpose of paying interest and taxes, and reducing to a very small extent the indebtedness on the land, and it is quite clear that but for these contributions the land could not have been saved from foreclosure by the creditors holding the liens against it. In January, 1899, after negotiations had been pending for some little time, a lease was executed to the South Penn Oil Company for the development of this land for oil and gas. Under this lease the lessee proceeded with the development, and it turned out to be very rich oil territory. Large sums were soon being received as royalties on the oil produced, and in a comparatively short time all of the debts upon the land were discharged and released. After this was done Hiram Lynch, to whom the royalties were paid, divided the royalties with his sisters for a considerable time. It does not appear

whether he paid to each of them one-third of the amount received by him, after deducting all of the liens and expenses paid, but it is shown that during the years the oil development was going on he paid to each of them something over $20,000.00 for their share of the oil royalties. In the beginning the payments made by him to his sisters were in considerable amounts. As the production of oil fell off these payments were greatly reduced until, finally, in 1905 or 1906, he ceased making payments to one of the plaintiffs, and to the other in 1910. Shortly after the oil production commenced Hiram Lynch persuaded his sisters and their families to give up the employments in which they were at that time engaged, and to come down upon the farm, assuring them that there was plenty for all three of them, and that they were all equally interested in the lands, and the profits arising therefrom. They did so, and after living upon the farm for sometime, in houses constructed by Hiram Lynch from the proceeds of the oil, for some reason not clearly shown, one of them moved back to her former home, and the other plaintiff was living upon the land at the time of the institution of this suit. In the year 1910 the oil royalties had been very substantially reduced because of the falling off in the production, and Hiram Lynch then for the first time denied that his sisters were in any wise interested in the land. He contended that the purchase made by him in 1879 from his uncle Wesley C. Lynch was with his own money, and for his own use and benefit, and that the same was true of the purchase made by him of his father's farm in 1887. He contended that the monies which had been furnished to him by his sisters and their husbands during all of the years when they were struggling to keep the land from being sold for taxes and interest, were loans made to him by them to be repaid later, and he further contended that all of the monies paid to them by him out of the oil royalties after the oil production came in were simply gratuities, and were not paid with any idea or understanding that there was an obligation upon him to do so. The contention of the plaintiffs, on the other hand, is that when Hiram Lynch obtained the conveyance from Wesley C. Lynch in 1879, all that was paid

therefor was the sum of $2000.00, and that this money was procured by a sale of their father's cattle. No other funds were ever paid on account of this purchase, except from monies derived from the lands themselves, and from advancements made by the plaintiffs to the said Hiram Lynch. They contend further that the purchase by Hiram Lynch of his father's land in 1887 from the bank was with the understanding that he would hold this land along with the Wesley C. Lynch land, and that they would all exert their energies to relieving the same from debt, and would be jointly interested therein upon the death of their father. The advancements of money made by them to Hiram Lynch began very shortly after their respective marriages in the early eighties, and continued at frequent intervals from that time until the oil production began in 1899. They say that there was no understanding that these advancements were loans; that they knew that Hiram Lynch had nothing except his interest in this farm, and his interest in it depended solely upon its increasing in value, it being encumbered at that time to practically the full value thereof. They contend that during all those years both Hiram Lynch and his father insisted on them making these advancements not as loans, but for the purpose of preventing their inheritance from being sold for the liens against it. They further show that during these years Hiram Lynch made statements to various people to the effect that his sisters were helping him in every way they could to prevent a sale of the farm, and that they each had an interest in it equal to his own. They deny that the monies paid to them out of the royalties received from the oil were gratuities, or were so intended by Hiram Lynch, but, on the other hand, their contention is that these monies were paid to them because they were entitled thereto as joint owners of the estate from which the oil was produced.

In reaching a conclusion in this case we must bear in mind the close relationship existing between the parties out of which ordinarily springs mutual trust and confidence. For this reason it is not strange that there is no satisfactory written evidence of all the transactions between the parties. The first inquiry is, did the conveyance made by Wesley C. Lynch

to Hiram Lynch in 1879 vest the title to that land in him as
a trustee for his father, or was he the sole owner thereof there-
under? That transaction happened nearly forty years ago,
and, of course, the evidence of the understandings and agree-
ments had between the parties at the time cannot be as satis-
factorily proven as would be expected were the transactions
of a more recent date. Hiram Lynch upon his part contends
that there was no understanding or agreement between him
and his father, or any one else, in regard to this tract of land.
He contends that he furnished all of the money which made
the two thousand dollar cash payment, and that all of the bal-
ance of the purchase money was paid after the oil came in
from the oil royalties; that he kept up the interest and taxes
from money derived from the farm and from loans made to
him by his sisters and their husbands. He undertakes to show
that at the time he made this purchase he had a few hundred
dollars, some of which he received from another uncle, Josiah
Lynch, and some of which he claims to have been the result
of his earnings in other employments. His evidence along
this line is unsatisfactory and inconclusive, both as to the
amount of these earnings, and as to the application thereof
to the payment of this two thousand dollar cash payment.
He introduces the testimony of a son of Wesley C. Lynch
to the effect that Hiram Lynch's father was out of humor
with him for buying the Wesley C. Lynch land, and this it is
urged is inconsistent with an understanding between them
that it should be held as the land of William B. Lynch. Hiram
Lynch further testifies that after he made this purchase the
two tracts of land were held separate and apart from each
other so long as the title to the William B. Lynch land re-
mained in William B. Lynch; that he pastured the land con-
veyed to him by Wesley C. Lynch and cultivated it, and took
to himself the proceeds arising therefrom; that he pastured
some cattle thereon for his father and charged his father
therefor the same as any one else. On the other hand, one of
the plaintiffs testifies that at the time of this purchase it was
talked over in the family, and it was agreed that, because of
the burden of debts upon the William B. Lynch land al-
ready, which was perhaps in excess of its real value, the title

to this land would be taken in the name of Hiram Lynch; that the two thousand dollars used for the cash payment of purchase money was procured by the sale of William B. Lynch's cattle; that the understanding was that William B. Lynch was the real owner of the land; that immediately upon this conveyance to Hiram Lynch the two farms were thrown together, and were thereafter used as one farm, the proceeds arising therefrom being commingled. In this latter statement she is fully borne out by the testimony of men who worked upon the farm. They testify that after the purchase from Wesley C. Lynch by Hiram both the Wesley C. Lynch farm and the William B. Lynch farm were thereafter used and treated as one farm; that the line fences were in many places removed and fields created out of part of one farm and part of the other. If this were all the evidence in the case we would have little trouble in concluding that the decree of the court below is justified, but the oral evidence given by the parties and those associated with them is supplemented by their subsequent conduct; and this conduct of the parties, their treatment of the land, their subsequent declarations, are more potent in determining their actual status than the testimony they now give after a controversy has arisen among them. Plaintiffs testify, and they are borne out by the husband of one of them, the husband of the other being dead, that very shortly after they were married Hiram Lynch and his father called upon them for money to assist in paying the interest and the taxes on the farm. One of them testifies that on one occasion Hiram came to her house an told her that they were all equally interested in this land, and that they must all make every effort they could to save money to clear it from the liens existing thereon. At that time which was in the early eighties, she says that she gave to Hiram Lynch a considerable sum of money for this purpose. Their testimony is clear that they did deny themselves many of the comforts and all the luxuries of life, and turned over to Hiram Lynch their savings which were used by him to prevent the foreclosure of the deeds of trust against the land. He claims these were loans. How inconsistent is such a contention with the conditions that surrounded the parties at

the time! Hiram Lynch had nothing from which they could
have expected the repayment of these sums of money which
he called loans.  His interest in the land depended entirely
on saving it from sale, and its enhancement in value, and is
it reasonable to suppose that these plaintiffs, without any
interest in the world in this property, would deny themselves
many of the things they wanted simply that they might lend
their money to their brother without any hope of ever having
it repaid, unless the farm subsequently increased in value?
In addition to this, during these years, Hiram Lynch in con-
versation with many people, told them of the efforts that his
sisters and his brothers-in-law were making, and of the as-
sistance they were rendering him in saving the farm from
sale, and declared that they were all interested in it, and if
they succeeded his sisters would have the same interest as
himself.  He contends that when he purchased his father's
farm from the bank in 1887 there was no understanding or
agreement that anybody should have an interest in it but
himself.  As before shown, he paid nothing upon this pur-
chase.  All of the purchase money for this land was paid out
of the proceeds derived from the oil royalties.  At that time
it was a part of the Lynch farm; it had been combined with
the Wesley C. Lynch land, and since 1879 the two had been
treated as one farm.  His sisters say that the understanding
was that Hiram should buy it, take the title in his name, and
they should all use their efforts to redeem it from the liens,
and be jointly interested therein.  This was the understanding
before and at the time he made the purchase.  He now de-
nies this, but, during all of the years, from 1887 down to
1910, he never made any denial that such was the case, but,
on the contrary, upon every occasion which it is shown that
he talked about the ownership of this land, he declared that
it was owned by himself and his sisters.  When he finally
made the lease for oil development upon the land he did not
treat it as his own, but his letters introduced in evidence
show that he consulted with his sisters and their husbands
in regard thereto, and when the dealings were finally con-
summated between him and the South Penn Oil Company, he
wrote a letter to the husband of one of the plaintiffs enclosing

the lease and commenting on the favorable terms he secured, and expressing the hope that they would be satisfied with what he had done, and expressing the belief that they were all safe if the development turned out as they expected. He asked the addresse of the letter to look over the papers and return them, or to take special care of them if he decided to retain them. This letter is entirely inconsistent with the contention that he now makes that he was simply the debtor of his sisters for small sums of money. In a very short time the royalties received from the oil discharged all the liens upon the land, and he continues to write to his sisters informing them of the results he is accomplishing in the way of clearing the land from the liens. On one occasion one of his sisters came to visit him, and while there wrote a letter to the other plaintiff in regard to the conditions. In that letter she advised that her brother Hiram was standing by and was advising her what to say, and pursuant to that advice she wrote that Hiram was arranging to have a deed prepared to convey to each of them a one-third interest in the land. Hiram denies this; says that he never knew of the writing of this letter; but it is shown that just about this time he consulted with his cousin, Judge Charles W. Lynch, in regard to making a deed to each of his sisters for a one-third interest in this land. This fully corroborates the statement contained in the letter above referred to. After the liens were paid off Hiram Lynch remitted to his sisters considerable sums of money at frequent intervals. In not a single one of these letters does he intimate that the remittances are gratuities, but the clear inference from all of them is that he is remitting them what is their due. He now claims, of course, that these remittances were simply gifts that he was making to his sisters. This contention is preposterous in view of the fact that on some occasions he says himself that he had to borrow the money to make the remittances, and it is out of the range of ordinary human probability that a man such as Hiram Lynch is shown to be by this record would borrow money to make gifts to his sisters, or to any one else. A short time after it was proven that the oil development would be substantial he insisted upon his sisters living

upon the land with their families. He insisted upon the
husband of one of them giving up the employment that he
had, and coming upon the land and helping him to conduct
their joint business. He built houses for them upon the land
and they did move upon it. He never said anything to them
about paying rent for these houses; he never intimated that
they were under any obligation to him therefor, but the tenor
of all his letters, and of all his dealings with them is that they
were all enjoying their joint estate. Many witnesses are in-
troduced who testify that on different occasions, covering a
period of many years, Hiram Lynch talked to them about
the ownership of this land, and he always stated that it was
owned by himself and his sisters; and it is clear from the
evidence in this case that he never had a thought of claiming
to be the sole owner of this land until in comparatively recent
years. While it may be true that the evidence of the plain-
tiffs to show the trust relation in the beginning is not en-
tirely clear, and would not be sufficient upon which to de-
cree that Hiram Lynch was a trustee from the time of his
purchase in 1879, still when we supplement that evidence
with the conduct of Hiram Lynch, clearly and unequivocally
proven, in relation to this land, the conclusion is irresistable
that the theory advanced by the plaintiffs is true. His deal-
ings with the land were entirely inconsistent with the theory
of his sole ownership thereof. His statements to other parties
are consistent only with the theory that he held the legal
title to this land as contended by his sisters. His division of
the oil royalties among them is clear proof that he recognized
their ownership therein. These circumstances and facts which
cannot be gainsaid speak louder than the oral testimony of
the witnesses as to their recollection of what transpired forty
years ago. They are sufficient of themselves from which to de-
duce that there was an understanding at the time of the
transactions that Hiram Lynch was to hold the legal title for
the benefit of them all. To our minds they are conclusive
that at the time of the purchase of the Wesley Lynch farm
the two thousand dollars purchase money was procured as
the plaintiffs claim, and that Hiram Lynch simply held the
legal title as trustee for his father; and that their contention

in regard to the purchase of the William B. Lynch farm in 1887 is correct, that Hiram purchased this with an understanding that it should be held together with the Wesley C. Lynch land for the benefit of the family.

But it is said that the plaintiffs are barred by their laches; that they have waited too long to assert their rights; that a court of equity will not now entertain their stale claims. There is nothing to this contention. The evidence is overwhelming that until shortly before the institution of this suit Hiram Lynch never denied their interest, but, on the contrary, admitted it at all times and under all circumstances. There was no reason for the plaintiffs to go into court to assert rights which were admitted. It is clearly shown, not only by the plaintiffs, but by outside parties, that Hiram Lynch was proposing to convey them their interest in this land, and that these proposals of his continued until a short time before this suit was actually brought. If bad faith can be charged to any party because of the delay, it is to Hiram Lynch. It might be said that he lulled his sisters into a sense of security by repeated promises to convey to them their interest so that he might prevent any litigation until after material witnesses had died and their evidence become unavailable.

We conclude, therefore, that at the time of the purchase of the Wesley C. Lynch property, it is clearly proven that the purchase money paid at that time was derived from a sale of William B. Lynch's cattle; that there was an understanding that the title would be taken in Hiram's name as a trustee for his father. We further conclude that all of the money that was ever paid upon this land was derived either from the land itself, or from the plaintiffs in this case, after the payment of the two thousand dollars; that their joint use of the two farms as one, and the purchase by Hiram in 1887 of the William B. Lynch farm, under the circumstances detailed, was in accord with the arrangement made in 1879 in regard to the Wesley C. Lynch farm. It is clear that the purpose of all these people was to create an inheritance for the children of William B. Lynch, and they all worked to that one end, and used their common property for that purpose,

It would be manifestly inequitable and unjust to say that the plaintiffs, after going through many years of hardship in order to save their joint inheritance, must be denied the fruits thereof, and all of it turned over to their brother. The joint efforts of all of them were necessary to save this land. Hiram Lynch could not have saved it by himself, and perhaps neither of the plaintiffs could, and it is only equity and justice, and carrying out the clear understanding of the parties, to say that each shall have an equal interest in the joint enterprise. While they were not partners in the purchase of land, or in the protection thereof in the full sense of the. word, yet the relation that existed among them was very nearly akin to that of partners. In fact, it may be said that it was a closer and more confidential relationship. They associated themselves together for a common purpose; they worked to the common end; and they devoted their means and their energies to accomplishing it; and when those efforts have succeeded, a court of equity will not allow one of the joint adventurers to take an unconscionable advantage of the others, and deprive them of their part of the fruits of their joint efforts. This conclusion is fully supported by the cases of *Kersey* v. *Kersey,* 76 W. Va. 70; *Bond* v. *Taylor*, 68 W. Va. 317; *Lantz* v. *Tumlin*, 74 W. Va. 196, and the authorities there cited. Our conclusion is that the circuit court of Harrison county erred in holding that there was not equity in the plaintiffs' bill.

We, therefore, reverse the decree and enter a decree here holding that the plaintiffs and the heirs-at-law of Hiram Lynch are the joint owners of the land in controversy, and that each of the plaintiffs is entitled to a one-third interest therein, and the heirs-at-law of Hiram Lynch to the other one-third thereof; and remand the cause for the purpose of having the legal title transferred to the real owners, for partition of the land among the owners as herein ascertained, and for the taking of such accounts as may be necessary to fully settle the interest of the parties in the issues and profits arising from the land.    *Reversed and remanded.*

WILLIAMS, JUDGE, *(dissenting)*:

The majority opinion concedes that the testimony is too

vague and uncertain to prove the alleged oral trust agreement
between Hiram Lynch and his father, and it is not necessary
for me to refer to it, further than to add, that if it stood un-
contradicted and could be given full faith and credit, it is not
of that full, clear and unquestionable character required to
establish a parol trust. *Troll* v. *Carter*, 15 W. Va. 567; and
*Cassady* v. *Cassady*, 74 W. Va. 53. But the opinion supplies
the lack of direct proof, by the interpretation which it places
upon Hiram Lynch's subsequent declarations and acts which,
it is said, are inconsistent with any other theory of the case
than that of a trust. That construction is not warranted, in
my opinion, by the clearly established facts. His alleged ad-
missions are either denied, or fully and satisfactorily ex-
plained by him. Moreover, if they could be regarded as
proven, they are as uncertain, respecting the alleged trust,
as the testimony of Mrs. Barbee, who is the only witness who
professes to have heard the matter of the purchase of the
Wesley C. Lynch farm discussed between her brother and
her father, before the deed therefor was made to her brother,
and are not sufficient to prove an oral trust agreement. The
most explicit evidence respecting Hiram Lynch's so-called ad-
missions that his sisters were jointly interested with him, is
found in the testimony of Judge C. W. Lynch. Although
Judge Lynch is unable to fix the date of the conversation,
it is evident from the character of his testimony that it oc-
curred after Hiram Lynch had paid off all the liens on the
land and, therefore, many years after he had purchased it.
This testimony was produced by the plaintiffs, and it is so
thoroughly convincing that Hiram Lynch was prompted by
generous motives, and not by considerations of any legal ob-
ligation, to share his good fortune with his sisters, that I here
quote the most material part of it. Judge Lynch says:
"I am not sure that he (Hiram Lynch) discussed those plans
with me more than once, but he did at one time tell me in
my office on Court Street that his sisters had helped him in
many ways in carrying the debt which was a lien upon the
land, that he thought it proper, and his intention was to
convey to them an interest in the property equal to his in-
terest, or in other words, he was by deed to convey to them,

to each of them an equal one-third interest so that the three of them would own the land together. He told me that he did that, because as I have said, they helped him to bear the burden of the indebtedness and assisted him in paying the interest on it on that indebtedness, and that as the land itself, the proceeds of the land itself had liquidated the indebtedness, that in his judgment he thought it right and proper that they should have an interest in it equal with him, and asked me what I thought about it, not in a legal sense, as I understood it, but in a business sense; and I remember I commended his purpose and plans and thought it was the right and proper thing to do." There is not the slightest intimation here that Hiram Lynch wished to discharge a legal obligation to his sisters, or that he recognized any such obligation. It clearly appears that his only reasons for wishing to make a deed to them for an interest in the land were, (1) that they had helped him when in straitened circumstances, and (2) that he had been fortunate in finding oil in the land. This testimony is more beneficial than hurtful to Hiram Lynch; it does not, in the slightest degree, tend to prove that he was a trustee for himself and sisters, but it does show that he possessed some generous impulses, notwithstanding the majority of the court seem to think him incapable of such emotions.

No deed was ever made, nor do I think the evidence is sufficient to prove that plaintiffs ever had any interest in the land. Mere admissions and oral declarations, that another has an interest in land, are too indefinite and uncertain to establish a trust. *Cassady* v. *Cassady*, 74 W. Va. 53.

It is not proven that William B. Lynch caused the title to his land to be placed in his son to be held in trust for all his children, as stated in the syllabus. He never had title to the Wesley C. Lynch place; Hiram bought it, and he accounts for every dollar used in paying for it. Although he was then living with his father he was about thirty years old, and had been working and earning money for himself. He had worked as bookkeeper for a coal mining company, conducted a mercantile business and dealt in calves, sheep and wool, and earned money shipping cattle for his uncle Josiah Lynch. While his good fortune in finding oil in the land, thus enab-

ling him to pay off the liens with the money derived from royalties, furnishes full explanation of his generosity toward his sisters, it has no bearing on the merits of plaintiffs' contention; if they were really beneficiaries it is not material how the land was paid for.

That Hiram Lynch, and not his father, bought the farm is proven, not only by his own testimony and the facts that the deed was made to him in fee simple absolute and his own notes were given for the deferred payments, some of which were made to extend through many years, but also by the testimony of a son of Wesley C. Lynch, who knew of the transaction. The opinion emphasizes the fact that, shortly after the purchase, the dividing fences were removed and the two farms were used as one, a fact not material, if true, but which is denied by Hiram Lynch, who says that, when his father pastured some of the land as he sometimes did, he charged him for it, as he did others for whom he frequently pastured stock. Moreover, he proved that, at the time he bought the farm, his father owed him, and filed with his evidence two notes made by his father to him, one for $43.00 and the other for $225.00, both dated in January, 1878, which were never paid.

The home place was sold on July 11, 1887, under a trust deed which his father had placed on it to secure more than $13,000 which he owed to various creditors, and was purchased by the Merchants National Bank, his largest creditor, at the price of $7,800. Hiram Lynch then later, on August 6, 1887, purchased it from the bank for $9,660, and borrowed $4,000 from R. T. Lowndes, a director of the bank, with which to make the cash payment and buy cattle with which to stock the farm, giving a trust deed on the land and the stock, to secure him and also to secure his notes for the deferred payments on the land. Not one dollar of the purchase money was supplied by his father, who was then utterly insolvent. Title to the land had passed from his father before Hiram purchased from the bank, and his father had no interest in the purchase. Hiram Lynch is fully supported, not only by the facts which call for the clearest kind of evidence to overthrow them, but also by the testimony of Mr.

Lowndes whose recollections of the transactions are very clear. Mr. Lowndes swears he first mentioned the matter of buying the farm to Hiram Lynch and induced him to buy, agreeing to finance him, which he did. He further says no one else, so far as he knew, was interested in the purchase with Hiram.

That his brothers-in-law, the husbands of plaintiffs, assisted him in carrying his burden of debt for a long time, is admitted, but they did it by lending him money on his own credit, and not because their wives had, or thought they had any interest in the land. He executed his notes to them, at the time, for all the money he borrowed, and has since paid off those notes with interest, and exhibits the notes executed to Clayton, aggregating about $1,500 all endorsed by Clayton "paid", in the year 1900, ten years before this suit was brought. The money he borrowed from the Barbees aggregated something over $600, and was paid in 1894 and prior thereto, long before oil was discovered in the land. He exhibits stubs of checks which were used in making the payments; and these payments are not denied. His letters to Clayton concerning the oil lease, and his furnishing him a copy of the lease are perfectly consistent with his claim of absolute ownership of the land. He then owed Clayton about $1,500, and wanted to satisfy him that he had a good prospect of being able to pay him soon. This is the most natural and reasonable interpretation to give his act; and the reason he was not as careful to inform the Barbees is because he then owed them nothing.

Among the numerous letters, appearing in the record, which passed between Hiram Lynch and his sisters, many of them containing importunate requests for assistance from him, and complaining of sickness in their families and of their imperative need of money, not one of them contains a single expression even intimating that the request for money is based on a legal right to demand it; nor is there a line produced, written by Hiram Lynch wherein he acknowledges they had such right. At one time he had about forty producing oil wells on his land, and the royalties therefrom placed him in good circumstances, better perhaps than he had ever before hoped for, and he could afford to be generous to

his sisters who were less fortunate than he, and wished to reward them because their husbands had lent him their hard earned money at a time when he was struggling to discharge a heavy burden of debt and relieve his land of liens.  To my mind, his only motive in sending his sisters money at various times, aggregating nearly $20,000 apiece, and in writing them to come and reside on the place, stating that there was enough there for all of them, was brotherly kindness.  Hugh S. Barbee was a locomotive engineer and had been permanently disabled, in a railroad accident which occurred in 1889, and had become a care, instead of a support, to his wife; and John F. Clayton, who was also a locomotive engineer, had impaired his health by hard work and exposure to severe weather, and these considerations no doubt appealed to his magnanimity. Is it reasonable that he would have prepared houses on the land for his sisters to live in, before they came, if he had recognized the rights they now assert?  Hardly; because, if he then acknowledged their interest, he would have known that they had as much right as he, to decide where they should live.    His explanation of why the invitation was given them to come is perfectly consistent with his present contention. He conducted a large store, had his farm to look after and much other business to manage, and he wanted their help, and, at the same time, desired to better their situation.  The record explains why the Barbees did not remain long; it was not the fault of Hiram Lynch.  There is no evidence that he divided the oil royalties with his sisters; he simply sent them some of the money derived from the royalties, there is no evidence of what proportion it was of the royalty he received. ·

This case does not fall within the principles announced in *Kersey* v. *Kersey,* 76 W. Va. 70, which was a suit between brothers over the property of a corporation in which they both held stock, thus showing both to be interested in the property when it was sold; nor *Bond* v. *Taylor,* 68 W. Va. 317, which was a suit growing out of a previous agreement to buy timber on joint account, for purposes of speculation; nor *Lantz* v. *Tumlin,* 74 W. Va. 196, which was a suit growing out of a mining partnership in which both parties had made investments.  But it does clearly come within the principles

declared in *Cassady* v. *Cassady*, 74 W. Va. 53; *Henderson* **v.** *Henrie*, 68 W. Va. 562; *Crawford* v. *Workman*, 64 W. Va. **10;** *McClintock* v. *Loisseau*, 31 W. Va. 865; and cases of that character.

I would affirm the decree.