The decree appealed from denied the relief prayed for and dismissed the bill.
The import of the bill is to compel the defendant to execute a deed to plaintiff for a tract of land of 100 acres lying on Glady fork in Randolph county, which was conveyed to defendant by deed of March 13, 1903, from E. C. and David B. Canfield, plaintiff claiming that the land belongs to him under and by virtue of an agreement entered into with his *Page 67 
father, the defendant, at the time of the purchase. Plaintiff's bill sets out in full the transaction by which the land was purchased from the Canfields, and avers that he and his father, the defendant, purchased the land together, plaintiff furnishing more than one-half of the down payment with the understanding that the land should be his and that what money was furnished as a part of the purchase price by his father was to be considered as an advancement out of the father's estate and not to be repaid by plaintiff; that he actually furnished $300 of the $500 which was paid in cash and was put in immediate possession of the land, upon which he has made valuable improvements amounting to at least $1,500, and that he has remained in exclusive possession from that day until the bringing of the suit, nearly twenty years, and has paid the taxes thereon; that the purchase money notes amounting to $500 (the entire purchase price being $1,000) were executed by his father and have since been paid by their joint efforts; that his father has been repaid all of the money which he paid on the purchase, out of the land and the timber thereon, having at one time received $100 for an option on the mineral and $600 from the timber sold off of the place; that it was understood at the time the land was purchased that it should be his and that the deed should be made to him whenever requested. The bill further says that in the earlier part of the twenty years after the purchase he requested execution of a deed, but was assured by his father that he had made his will and that the land would go to him by that method; that he and his father have been in perfect accord and that he was not insistent upon execution of the deed and carrying out the agreement until in later years after his father married again when an apparent estrangement arose between them; that his father is seventy-seven years old, has become feeble and becoming incensed because plaintiff would not furnish him with $100 except upon execution of the deed promised, has advertised the land for sale on the market. The bill asks for prevention of the sale and the specific performance of the contract and that a deed be made to him for the land.
The answer denies the material allegations of the bill, and *Page 68 
avers that defendant purchased the land for himself and not for his son, the plaintiff, but admits that plaintiff was put in possession of the land by him with a view of furnishing him a home for himself, his wife and children; admits that he has made improvements thereon and has remained in possession; avers that the rents, issues and profits and timber cut off of the land by plaintiff would more than equal the improvements; denies that defendant paid any cash payment or helped pay any of the deferred payments; denies that plaintiff has paid the taxes on the land; admits that about $300 of money and property furnished by plaintiff went into the land, but charges that it was a loan made by plaintiff to defendant; admits that the loan has never been repaid but that upon a proper accounting it will be paid; avers that it was his intention to give the land to the son but because of plaintiff's recent misconduct he has decided not to do so, but that he intended to give to plaintiff's wife and children the portion of his estate he had hitherto intended for him; and now he has become old and feeble and needs money and finds it necessary to sell the land.
It appears that the father owned several tracts of land in Randolph county and that plaintiff, his son, married and with three children, was a foreman on railroad construction occupying a railroad construction house on his father's farm and that he had in cash $200 saved from his wages. The Canfields desired to sell the 100 acres and information of that desire was conveyed to the father who said he was interested and would probably purchase the land for his son French. French (the plaintiff) says his father came to him and told him the land was for sale and that if he wanted it he would help him purchase it and asked him to go and inspect the land. Being busy he could not then go, but in a few days thereafter went with his father and viewed the land and they concluded to purchase it. On the 23rd of March, 1903, they went to Canfield's house where the deed was drawn. He furnished $200 for the purchase price giving a check for the same, either to the Canfields direct or to his father on that occasion; that his father owed him for a horse which he says amounted to $85 but which the father says he put in at $100, *Page 69 
making $300 of the cash payment which French (the son) paid on that occasion. The grantors in the deed are dead. James R. Canfield, who was present at the time the deed was made, says both the father and son were there and the father asked French which way the deed should be made, and French told him he did not want it made to himself at that time, until he could "get out of that law suit." referring to some litigation he was having over a lien claimed upon some other land which he had purchased from some of his wife's people. Afterwards, when this witness was preparing to move on the land in question to work, he had a talk with the old gentleman who told him to go on and whatever he and French did was all right, that the place belonged to French; that French was to have that part and he could make him a deed for it at any time. N.W. Canfield, a son of one of the grantors, says that on different occasions, both before and after French took the land, defendant told him the land was purchased for French. Four of five other witnesses who lived in the neighborhood testified that on different occasions defendant told them that the land was intended for French. A. L. Raines, a brother of plaintiff, says his father had told hm that he and French bought the place together and that French had paid some of the money on it, but how much he was not informed. This witness says his father told him the land was intended for French. A few days after the deed was made, plaintiff moved on the land, and the improvements placed thereon are estimated by him to be $1,500; several witnesses who were examined on the value of the improvements placed them all the way from $600 to $1,000. These improvements consisted of making a substantial addition to the house, which is of log structure, building porches, laying floors, ceilings, covering the barn and fencing the land with wire fences, cleaning up the brush fields and removing the rocks therefrom. In comparison with the value of the land it appears that these improvements were substantial. Several years after the date of the deed the father sold the timber off of the land and a piece adjoining, the greater portion from the land in question, for which he received $600. Afterwards the son sold the remaining timber, for which he received about *Page 70 
$40. There is no controversy about the removal of the major portion of the timber, and the fact that the father got the benefit of it. He also collected $100 for an option for some minerals supposed to be under the land. The son testified that he paid one-half of one of the deferred purchase money notes and that he had paid the taxes on the 100 acres; and the year prior to the bringing of the suit he had paid all of his father's taxes, including the taxes on the 100 acres. The father's evidence is to the effect that his son had no interest in the land or its purchase, that he was not with him at the time of the execution of the deed or at the time he inspected the land before the purchase; that he furnished no part of the purchase money, saying that he had borrowed the $200 from his son and that he owed him $100 for the horse, all of which went into the cash payment. He says he still owes these sums and intends to pay the same back when he sells the land. It does not appear that any note or memorandum of the loan was given. He denies that he ever told any of his neighbors that the land was purchased for French, and denies that he had any conversations with them about it. He denies that French paid any of the taxes, except all of his taxes for one year which he admits were paid by his son. On two of the tax tickets we find that there is a memorandum that French had paid a portion of all of the father's taxes for those years. It is very evident that the memory of the father had become imperfect at the time his deposition was given. He says he intended to will the land to French but that a short time before the suit was brought he called on his son for a loan of $10 and was refused; then afterwards for $100 which the son refused, and he concluded that he would sell the land to raise money to meet some of his pressing necessities. He denies that he had any contract or understanding with his son about the purchase of the land. He admits his immediate occupancy and possession of it, but says it was for the purpose of furnishing his son a decent place to live and on which to raise his family. Plaintiff says that on different occasions when he asked his father to make him a deed his excuse therefor was that his wife "Bec." (plaintiff's step-mother) would not sign it. This is the substance of the testimony. *Page 71 
To support the decree it is argued that the contract, the specific execution of which is demanded, is so indefinite and uncertain that a court of equity cannot enforce it. It will be observed that the defense is that no contract at all was in existence. Defendant denies that there was any understanding or agreement that this land or any part thereof was to belong to his son; that he purchased it on his own initiative and with his own money, and placed his son on the land in order to give him a place to raise his family; a fatherly interest to help the son along. If there was a contract or agreement, we must look to the plaintiff's evidence to determine what it was, because there is a total denial of any contract on the part of defendant. Was there a contract or understanding? We think the vast preponderance of the evidence is that there was an agreement. Then what was it? Plaintiff says his father came to him while he was working on the grade and told him that he, defendant, could buy the Canfield place and if he wanted to, he would help him buy the place and he could move down there; that they went together and looked at the land and concluded to buy, and that the land was bought for him and with the understanding that he should have a deed therefor whenever he wanted it. His explanation of the fact that the deed was made to his father is that he had purchased a piece of land from some of his wife's relatives on which there was a lien about which he knew nothing until after the lienor or some one had instituted a suit which he was defending and did not care at that time to have the land deeded to him. He says he did not have this done to hinder or delay or defraud any of his creditors because he had none at that time; the lien about which he was involved in litigation was not his debt. It was against the land he had purchased, but not against him. This statement of the contract and agreement is corroborated by expressions and declarations of the father as told by many of the witnesses, some of whom say that the old gentlemen told them that the land belonged to French; others that it was intended for him; and one other, that French had asked him to make a deed about a year before the suit was instituted, and he said that he had made a will for that purpose, and he would have it in that *Page 72 
way. The circumstances impel the conclusion that there was a contract. The fact that the son took possession and made valuable improvements upon the land and lived in exclusive possession upon it for nineteen years without question from his father; that he exercised ownership over it in cutting the remainder of the timber, known to his father, the remodeling of the house and making valuable improvements thereon as well as building substantial fences and cleaning up the land, would impel the conclusion that he at least was relying upon the fact that the land was to be his by virtue of some agreement or understanding with his father. We think that plaintiff has not only established the existence of a contract but has shown what that contract was with sufficient definiteness which can be enforced by a court of equity. The relations between the father and son were cordial until recent years when the father became enfeebled and when it appears that the step-mother became somewhat estranged. The son testified that he had always helped his father work on his place, had paid him in labor much in excess of the taxes which his father had paid for him and which were charged on his father's tax tickets, which included many other tracts of land and his personal property; that he had furnished his father money, and that the break came when his father wanted $100 from him which he proposed to give to his father if he would execute the deed which had been promised him, and it was then that the step-mother became abusive to him, and a short time afterwards his land was put on the market for sale. While the father says the $300 furnished by the son went into the land, he claims that this amount was borrowed and that he still owes it and will pay it back when he sells the land. It will be observed that no evidence of that alleged obligation was taken, and it has long since expired by limitation. Moreover, the witnesses, including the plaintiff, and the circumstances contradict this theory of a loan. It is evident that this money went into the land and that the father took the title at the request of his son or by agreement between them. Under this evidence, the father would be a trustee holding the legal title of the land for his son, under the well established principle that where one person furnishes money for the purchase *Page 73 
of property and the title is taken by another a resulting trust springs up for the benefit of the former. The interest of him who pays the money is not a mere equity which can be discharged by repayment by the trustee in money. It is an equitable estate in the land in which the legal title is vested in the trustee, and may be conveyed, transferred, devised or otherwise dealt with as property. It may be enforced against the trustee, his heirs and personal representatives and all others who derive title from him as volunteers or purchasers with notice, but not as against bona fide purchasers for value without notice. 3 Pom. Eq. Jur. sec. 1043. The father paid off the purchase money notes, except one-half of one of the notes paid by the son. The father has been fully or partially repaid out of the son's timber and the option on the mineral. Possibly there are other sums to which each would be entitled; a proper accounting would determine these mutual demands.
We think the preponderance of the evidence warrants the conclusion that the land was purchased for the son, and was to be his; and that his father was helping him to pay for it. Whether the sums paid by the father were to be advancements, as claimed by the son, is not so well established. The circumstances indicate that they were in the nature of a loan and not a gift. Whether a transaction is a gift or loan is always determined by the intention of the donor as gathered from the facts attending the transactions. Mahon v. Johnston, 7 Leigh 317. The father has retained the title to the land into which his money went, a circumstance which strongly repels the intention to make a gift. Where a parol gift is made, complete delivery is a most essential circumstance. 2 Blackstone Com. 341; Dickeschied v. Bank, 28 W. Va. 340. While the son was given complete possession of the land, he had no power to encumber or sell. The evidence to establish a gift inter vivos
must be clear and convincing of every element necessary to constitute a gift. Brock v. Brock, 92 Va. 173;Collins v. Lofftus, 10 Leigh 5; Brown v. Handley, 7 Leigh 119. The father did not relinquish complete dominion over the thing alleged to have been given or advanced. The evidence and circumstances do not measure up to the full requirement of *Page 74 
the law to prove a gift of the money from the father to the son. On the other hand, the evidence and circumstances do show that the land was purchased by them for the son, and that the legal title is held for the latter. Perry on Trusts, Vol. 1, sec. 133, says: "if one should advance the purchase money and take the title to himself, but should do this wholly upon the account and credit of the other, he would hold the estate upon a resulting trust for the other."
The decree denies to plaintiff any interest in the land. The purchase money which he put into the land is lost to him under the decree, for, as a debt it has long since been barred by time. His improvements and labor are also denied. The expressed intention of the father is to disinherit him, because of refusal to extend him a loan, or because of some domestic trouble which the son has experienced. The pleadings and evidence warrant a decree extracting from the father the legal title to the land and vesting it in the son; and this relief should have been granted. Inasmuch as the evidence does not justify a finding that the father intended the sums paid by him on the purchase were intended as gifts or advancements, the relation of debtor and creditor exists between the father and son and there should be an accounting between them to determine their mutual claims.
The decree will be reversed, the bill reinstated and the cause remanded.
Decree reversed; bill reinstated; remanded.