## CHARLESTON.

DELLA ELLIS *et al v.* A. T. MYNES *et al.*

(No. 6302)

Submitted February 12, 1929. Decided February 19, 1929.

*L. R. Via* and *J. P. Douglas,* for appellants.
*H. H. Darnall* and *F. W. Riggs,* for appellees.

LIVELY, JUDGE:

The plaintiffs are the children of A. T. Mynes, defendant, and seek in this suit to extract from him the legal title to 214 acres of land situated in Putnam county. These children claim the land under a parol contract by which the father purchased the land for them and after it was paid for took the title thereto. The decree appealed from granted the children the relief prayed for in their bill and found that A. T. Mynes, the father, held the legal title for the sole use and benefit of the children who are decreed to be the equitable owners of the land and entitled to the legal title thereto; and directed defendant, A. T. Mynes, and his newly married wife, Kerren Mynes, to execute a deed to the children for the land, and failing to do so, that a special commissioner convey the title.

The tract of land is known as the "home tract" where defendant, A. T. Mynes, was reared and where these children were born, and on which they resided prior to the year 1913. In that year, the land was sold under a decree in a partition suit. Previous to the sale, the family had moved to Huntington, where the father had obtained employment as a blacksmith in the railroad shops. At that time Della Ellis was 28 years of age, Anna Paul 25, Thomas Mynes 22, and Ora 15 years of age. According to the evidence of these children, supported by other witnesses, the father proposed and they

all agreed that if the children would assist him in paying for the land, stay there at home and work and help pay for the land, he would go to the commissioner's sale and buy it in and when paid for the children should have the land. While the answer of the father denies this agreement, he does not specifically deny it in his testimony. The substance of his evidence is that he intended to give the land to his children "after he was through with it." He bought the land in at the judicial sale for $2,501.00, paid the cash payment of one-third, and executed his bonds in one and two years for the remainder of the purchase price. He borrowed the money for the cash payment out of a bank giving his notes therefor, indorsed by two of his personal friends. This borrowed money was repaid in due season, and the deferred payments on the land were met sometime between the date of purchase and the year 1919, when the deed was made by a special commissioner to defendant. The family was in perfect accord until after the death of the mother in the latter part of 1924 or first part of 1925, and until some time in the year 1925 when the father announced his intention of marrying his co-defendant, Kerren Mynes. Upon learning of the contemplated marriage the children requested conveyance to them of the legal title to the land, and according to their evidence, and some independent evidence, the father directed them to have a deed prepared; this deed was prepared and he raised some objection to it because the minerals had not been reserved to him and did not sign; and afterwards refused to sign, giving as a reason that the wife (or the lady to whom he was engaged) announced that she did not wish to have a man who had nothing. A short time afterwards this suit was instituted to extract title from him. The father was about 63 years of age at this time, and the trouble began when the second wife arrived on the scene.

We think the evidence is reasonably clear that the land was originally agreed to be purchased and transferred to the children if they would assist in paying for it. Many of defendants' friends and neighbors tell of declarations by him which indicate that such was the agreement. The children and other persons say that he actually went upon the land

and pointed out the portions which each one of them should have, and some of the children say that he insisted on them improving their respective shares by planting orchards and the like thereon. The upper portion on which the house was located and containing about 50 acres was said to be intended for Ora Ellis; and a short time after the purchase she and her husband sold their property in the City of Huntington and moved on that particular portion of the land where she has resided since, and which she has improved according to some of the witnesses to an amount between $2,000.00 and $3,000.00. Defendant denies that he ever designated which portions of the land should go to his respective children and also denied that he had directed them to make a deed for the land just prior to the time of the break in their family relations. The attending circumstances point to the fact that some kind of agreement existed between the father and the children relative to the ownership of the land. They corroborate the distinct proof the children supported by one or two other witnesses that the parol agreement actually was made. It is not clearly controverted, as above stated, by defendant Mynes in his testimony.

Now, by whom and in what manner was the purchase money for the land paid? Defendant says that he paid for the land out of his wages and from rents, and from oil and gas rentals on the land itself. His actual wages in 1913 were $795.73, and in 1919, $1,806.50, as appears from a statement from the railroad company of his actual amounts received by him as wages in the years 1913 to and including 1919. The average wage which he received from the railroad company during this period was $93.75 per month. In 1913, the father bought a lot in the City of Huntington for which he paid $630.00 and proceeded to build a house thereon in which to dwell. It does not appear how much this house cost in construction, (defendant could give no figures thereon), but the size of the house was ten rooms with a frontage of 26 feet running back 56 feet, and was finished throughout. Nineteen hundred dollars was borrowed from a building and loan association for that purpose, and the debt was paid back at the rate of $19.50 per month. During the time this house and the land in

question was being paid for, defendant purchased two other tracts, one of eleven acres at $10.00 or $12.00 per acre, and the other of 100 acres (the record not disclosing the price paid), which tracts adjoined or were near to the land in controversy, and paid for those two purchases in the manner here set out. It reasonably appears that all of these expenditures were paid out of a common fund which arose in this way: the wife and daughters established a boarding house in their residence and kept boarders. The father turned over to his wife his pay check from the railroad company; the son who was also working in the shops turned over to her one-half of his wages which were about $70.00 per month, and the girls labored with their mother in operating the boarding house. Defendant when pressed as to where he got the money to pay for these various purchases and obligations said that his wife and the children made about $150.00 per month out of the boarding house operation. The mother seemed to be the financier and handled the common fund out of which these various obligations were paid. The dwelling house and lot were paid for and the title taken by defendant, and after his second marriage, was sold or traded at $8,000.00 and another house and lot received in the trade or in which the money was invested, was deeded to the new wife. Defendant still has the title to the two tracts adjoining the land in controversy. No books or accounts were kept by the family concerning these purchases and payments. It is quite natural that none would be kept. The family then was in accord. It would be impossible for any of the parties now to say how much was actually contributed by each for the payment of the purchase price of the land in controversy. The common fund went to pay for all of these purchases and defendant has received from that common fund a property which amounted to $8,000.00, not including the two tracts of land which he yet has in his own name, and considerable personal property purchased and paid for out of the common fund since 1919. There is some controversy and uncertainty as to the amount of labor which the girls expended in conducting the boarding house which we think is entirely immaterial, for no complaint was ever. made until this suit began as to anyone not perform-

ing his part of the contract. The rentals and oil and gas money which was derived from the land and which defendant says helped in paying the purchase price therefor would inure to the benefit of the true owners of that land, and not to him, if the agreement and intention was that the children should have this land. In the year 1922 (the land had been paid for then) the son moved to the land and undertook to farm and improve that portion he claimed to have been agreed upon as his portion of the land. His father, in a commendable fatherly spirit, helped him in various ways to get along, assisted him with machinery and supplies but he only stayed there two years and found it unprofitable to farm.

We think the evidence establishing the express oral trust is clear and unquestionable. It meets the requirements of our decisions in such instances as illustrated in *Hatfield* v. *Allison,* 57 W. Va. 374. The circuit court so found and we approve that finding. On which side of the controversy do the equities lie? It is insisted by counsel for defendant that the father should not be deprived of his earnings put into this land and leave him penniless in his old days. That is on the assumption that his wages went into this particular tract of land. It would be impossible to have an accounting between these parties to ascertain what particular money was used for the purchase of this land or what particular part of the moneys derived from the services of the girls in the boarding house was applied thereto; or what particular money went into the other properties then being paid for. It would be an impossibility to do so. At any rate, all of the properties were paid for out of the common fund and the father certainly has been taken care of by the Huntington property for which he received $8,000.00 and the tracts of land in Putnam county adjoining the land in controversy. We think it may be reasonably presumed that the moneys paid in by the son and the services of the daughters in the boarding house taken together with the rent and royalties from the land in question was sufficient in the six years to pay the $2501.00 purchase price of the land in controversy. The equities are in favor of the children. The theory and evidence of the father is that these children should have this

particular tract of land "when he got through with it". It is clear from his own testimony, his declarations, and the circumstances, that he always intended them to have it, but since his last marriage he has seemingly reversed that intention because he was attempting to sell the land. The children stopped that contingency by recording a *lis pendens* when they began the suit. To permit the father to sell the land would deprive them of the property into which their labor and money went.

Because it cannot be shown clearly and explicitly what each of the children contributed in money or labor to the purchase price does not defeat the express trust. *Barbee* v. *Lynch,* 82 W. Va. 384; *Raines* v. *Raines,* 96 W. Va. 65. It would be otherwise if it was a resulting trust, for then the interest of each one would be governed by the amount he paid on the purchase. But here they all seek to extract from the father the bare legal title, and it is immaterial to him what division may be made between them. The decree cannot be reversed on that ground.

The clear equities being in favor of the decree, it will be affirmed.

*Affirmed.*