# CHARLESTON

### BIG HUFF COAL CO. v. THOMAS *et als.*

## Submitted March 2, 1915.   Decided April 13, 1915.

1. QUIETING TITLE—*Cloud on Title—Bill—Allegation of Possession.*
   A bill by a grantee to cancel a prior contract of sale, executed to another by his grantor, as a cloud on his title, must aver possession of land. (p. 164).

2. SAME—*Remedy at Law.*
   Equity will not entertain a suit to cancel a contract for the sale of land, solely on the ground that it was procured by fraudulent representations. In such case the law affords full, adequate and complete remedy.  (p. 164).

3. CANCELLATION OF INSTRUMENTS—*Remedy at Law.*
   Although equity jurisdiction to cancel written instruments does not depend upon the adequacy of a legal remedy, yet it will decline to exercise it if complainant's remedy, either by action or defense at law, is plain, adequate and complete.  (p. 164).

4. SAME—*Failure of Bill—Effect on Cross-Bill—Independent Issues.*
   Where plaintiff files a bill, praying for the cancellation of a written contract, and defendant files a combined answer and cross-bill, alleging affirmative matter, not only as defensive, but also as cause for affirmative relief, and prays for specific enforcement of the contract, the bill and cross-bill present independent issues, and the failure of the original bill does not necessarily carry with it the cross-bill.  (p. 167).

5.  SPECIFIC PERFORMANCE—*Right to Relief—Discretion.*

    Specific performance is not a remedy, existing as a matter of right, but rests in the judicial discretion of the chancellor, and to entitle a complainant to the relief, he must show that he has acted in good faith, and has been ready, willing and eager to perform the contract on his part.    (p. 167).

(LYNCH, JUDGE, absent.)

Appeal from Circuit Court, Wyoming County.

Suit by the Big Huff Coal Company against S. B. Thomas and others. From decree for plaintiff, the defendant named appeals.

*Reversed and remanded.*

*R. F. Dunlap,* for appellant.

*Holt, Duncan & Holt,* for appellee.

WILLIAMS, JUDGE:

On October 1, 1909, L. B. Cook, by written contract, sold to S. B. Thomas the mineral underlying two certain tracts of land in Wyoming county, described as containing 900, and 416 acres, respectively, and all the timber thereon, for mining purposes, except the poplar, ash, cucumber and walnut, at the price of $35 per acre, the quantity to be ascertained by survey, to be thereafter made. A survey was to be made by J. W. Heron of Huntington, and was to be begun within twenty-five days, and completed as soon as possible. Cook was then to execute to Thomas, or to anyone whom he might in writing designate, a deed with covenants of general warranty and against all encumbrances. One-third of the purchase money was to be paid in cash, on delivery of the deed, and the remaining two-thirds in one, and two years thereafter, with interest, and was to be secured by retention of a vendor's lien. Cook was also required to give Thomas five days written notice of the time when he would be ready to deliver the deed. The contract was signed by L. B. Cook and his wife, and by Thomas and acknowledged by him only, and recorded in Wyoming county October 14, 1909. The paper is spoken of throughout the record, by witnesses and attorneys, sometimes as a contract, and sometimes as an option. But it is, in express terms, a contract of sale. It recites a cash considera-

tion of $1.00, and Cook testified that nothing was actually paid. This point is not material to the validity of the contract, for it is under seal, which imports sufficient consideration. But it is important in determining whether or not plaintiff's bill is bad on demurrer, for not averring its readiness to restore Thomas to his *status quo*. Nothing having been paid by Thomas, there was nothing to be restored to him, and no tender was necessary.

For reasons hereinafter to be given, the sale was never completed, and, on the 16th of September, 1911, Cook sold the same, and other lands, to James D. Lowry, and, on the 21st of October, following, he and L. B. Cook made a joint deed therefor to the Big Huff Coal Company, a corporation, the respective wives of the grantors uniting in the conveyance. The deed conveyed all the mineral in both tracts, and all the timber on the larger tract, under eighteen inches in diameter, except the poplar, ash, cucumber and walnut, and all the timber, without regard to size, except the poplar, ash, cucumber and walnut, on the smaller tract. The 900 acre tract was found to contain but 850 acres, and will be hereafter so designated in this opinion.

Lowry and the Big Huff Coal Company purchased with knowledge of the Thomas contract. In his deed to the Big Huff Coal Company, Cook expressly assigned to it all the rights he had in his contract with Thomas, and authorized said company ''to sue for its benefit to enforce said option or agreement, or to cancel or set aside same.'' But it was expressly stipulated that the acceptance thereof was not to be considered an acknowledgment of the validity of the Thomas contract, or of his right to enforce it.

Shortly after the recordation of its deed, the Big Huff Coal Company brought this suit to cancel the Thomas contract, as constituting a cloud upon its title, alleging that he had procured it through false and fraudulent representations made to Cook; that he had made material alterations in it, after he had procured Cook and his wife to sign it, without their knowledge or consent; and that he had failed and refused to comply with it, after he had received written notice from Cook, that he was ready to make him a deed, in compliance with its terms. The bill further alleges abandonment of the contract by

Thomas, long before Lowry purchased the land; also that he was not, on the 1st of October, 1909, or at any time since, ready, able and willing to comply with his contract by making payment for the land; and that said Cook and wife had taken no steps to have the contract cancelled for fraud, because they were lulled into a state of quietude and inaction, by the continuous and repeated misrepresentations of said Thomas. L. B. Cook and wife and James D. Lowry, as well as S. B. Thomas, were made defendants to the bill. Thomas demurred and also filed a combined answer and cross-bill, denying the allegations of fraud, and failure, on his part, to comply with the contract, and denying that he had, in any way, altered or changed the terms of the contract. He averred that he was always, and is now, ready and willing to comply with his contract, but that L. B. Cook had not cleared his title of certain defects, which made it impossible for him (Cook) to perform the contract, until about the time he sold the land to Lowry, and that he had no knowledge of that sale, until after it had been consummated by deed to the plaintiff. The cross-bill answer made L. B. Cook and wife, C. F. Cook and A. H. Cook, who claimed a conflicting interest in the larger tract of land, parties defendant, and prayed for specific performance of his contract, averring his ability and readiness to comply with its terms. L. B. Cook and wife, and Lowry and the Big Huff Coal Company, all demurred and replied specially to the cross-bill answer. Their replies deny the allegations of the cross-bill, and contain, in substance, the same matter averred in the original bill. On the issues thus joined, numerous depositions were taken; and on the 29th of May, 1912, the cause was heard and a final decree entered, overruling the demurrer to the original bill and cancelling the contract of October 1, 1909. Thomas has appealed and assigns numerous errors.

One is that the demurrer to the plaintiff's bill was improperly overruled. The bill does not aver actual possession of the land by plaintiff, and it is insisted that this omission is fatal. This court has held, in numerous cases, that to entitle a plaintiff to maintain a bill to remove cloud from title, he must have the legal title and must also be in actual possession. *Iguano Land &c. Co.* v. *Jones,* 65 W. Va. 59; *Whitehouse* v. *Jones,* 60

W. Va. '680; *Poling* v. *Poling,* 61 W. Va. 78; and *Clayton* v. *Barr,* 34 W. Va. 290. The mere constructive possession, which, in the absence of actual possession, follows the title, and is good for some purposes, is not sufficient to support a bill to remove cloud from title. Plaintiff must have a *pedis possessio* on the land, else he will be left to his remedy at law. *Mackey* v. *Maxin,* 63 W. Va. 14, and *Hitchcox* v. *Morrison,* 47 W. Va. 206. But counsel for appellee insist, that the rule respecting possession does not apply where other distinct grounds of equity jurisdiction exist, and that jurisdiction exists, in the present case, to cancel the contract on the ground of fraud. That equity will relieve against fraud, is generally, though not always true. It declines jurisdiction, even in matters of fraud, where the party complaining has a full, adequate and complete remedy at law, either by action or defense. The contract here involved is simply executory. It does not purport to pass title, and, if Cook were the party complaining, he could not maintain the suit without having possession. The court would not entertain his suit to cancel the contract, on the sole ground that it was fraudulently procured, simply because he might be personally liable on it. The law gives him a remedy, by an action for the deceit; and, if an action were brought against him for a breach of it, he could defend by proving the fraud. It is only on the ground that the contract constitutes a cloud on his title, that even Cook himself could maintain a suit to cancel it, and to sustain such a suit, possession is indispensable. If Cook could not maintain such a suit without possession, certainly his grantee can not, for it acquired no greater equities than he had, if the contract was actually procured by fraud, Cook was in no danger from it, for Thomas could confer no greater rights upon another, by assigning it, than he had himself. Moreover, there is no privity between the plaintiff company and Thomas, respecting the contract, and hence no mutual obligation or liability. Neither has a personal right of action against the other for its breach. Hence, plaintiff is only indirectly interested in the alleged fraud, as an extraneous matter, rendering void a writing which, on its face, is a menace to its title, giving right to apply to equity to have it removed as a cloud. It is not directly and personally affected by the fraud, and if it can

not maintain its suit, as one to remove cloud, it has no right whatever to ask for a cancellation of the contract. So that, even if Cook could have it cancelled for the fraud, personally affecting him, it does not follow that plaintiff could do so. But Cook himself could only maintain a suit in equity, as one to remove cloud. He could not have the contract cancelled solely for fraud. Equity will not entertain a suit to cancel every kind of contract, simply because it was fraudulently procured. The party complaining must be in someway endangered by it, to entitle him to that relief. Equity refuses to cancel non-negotiable instruments, or negotiable instruments overdue, for fraud. Because the obligor, in such cases, has a full, adequate and complete defense at law, and stands in no danger. 6 Cyc. 292; and 24 A. & E. E. L., (2nd ed.), 636. Likewise it refuses to cancel policies of insurance, after the death of the insured, on the ground that the policy was procured by fraudulent representations. *Globe Mutual Life Ins. Co.* v. *Reals et als.*, 79 N. Y. 202; *Des Moines Life Ins. Co.* v. *Seifert*, 210 Ill. 157, 71 N. E. 349; *Phoenix Mutual Life Ins. Co.* v. *Bailey*, 13 Wall. 616, 20 Law Ed. 501. While equity jurisdiction, in the federal courts, depends upon the judiciary act, still it would seem to be, in this respect, but declaratory of the principle adopted and followed by courts of equity generally. The general rule is, that although jurisdiction to cancel written instruments does not depend upon the adequacy of complainant's legal remedy, yet equity will refuse to exercise it, where complainant's remedy, either by action or defense at law, is plain, adequate and complete, 6 Cyc. 290; 2 Pom. Eq., Secs. 911 and 914; 4 *Id.*, Secs. 1377 and 1399. "Where complainant has a complete remedy at law, equity will not assume jurisdiction, even in case of fraud." *Huff* v. *Ripley and Tinsley*, 58 Ga. 11. *Buzard* v. *Houston*, 119 U. S. 347, was a suit in equity, by the purchaser of cattle, praying for a cancellation of the contract of purchase, on the ground that it was procured by fraudulent representations, and the court denied relief, for the reason that complainant had a full, adequate and complete remedy by action at law for deceit. *Burner* v. *Meigs et al.*, 64 N. Y. 506, was a suit by the purchaser of real estate, to rescind the contract of purchase, on the ground that the vendor had no

power to sell, and relief in equity was denied, for the reason that complainant had a perfect defense at law. The failure to aver possession was fatal to plaintiff's bill, and the demurrer thereto should have been sustained for that reason. In other respects the bill is good. We do not think it is multifarious, or that its allegations are inconsistent.

But defendant Thomas, by his answer in the nature of a cross-bill, set up affirmative matter, not only as a defense to the original bill, but as cause for affirmative relief, and prayed for the enforcement of his contract. The bill and the cross-bill presented two suits, two issues relating to the same subject matter; and the cross-bill may stand independent of the original bill. The court could dismiss the original bill, and still retain the suit presented by the cross-bill. Being a cross-bill for affirmative relief, as well as an answer, it does not necessarily fall with the original bill. *W. Va. &c. Land Co.* v. *Vinal,* 14 W. Va. 637, (Syl. pt. 14); *Pethtel* v. *McCullough,* 49 W. Va. 520, and discussion by Judge BRANNON at page 524; 1 Hogg's Eq. Proc., Sec. 205; *Ragland* v. *Broadnax et al.,* 29 Grat. 401; *Fishburne* v. *Ferguson,* 85 Va. 326; and *Griffin* v. *Griffin,* 118 Mich. 446. Therefore, sustaining the demurrer to the original bill does not dispose of Thomas' cross-bill. The special replies, or answers thereto, of Cook and the Big Huff Coal Company set up the same matters in defense that were made the basis of plaintiff's prayer for relief in its original bill; and the evidence in the case is just as applicable to the one suit as to the other.

Was Thomas entitled to have the contract specifically enforced? That depends, primarily, on whether or not he was, at all times, ready, willing and eager to carry out the agreement on his part. Upon that issue he carries the burden, and we do not think he is sustained by the evidence. J. W. Heron, the surveyor at first mutually agreed on to make the survey, did not do it, and the parties thereafter agreed upon George Beddow, who did it. Thomas assumed to pay him, and Cook paid his helpers. After the survey was completed, Beddow furnished Thomas with his report and plat of the survey. Thomas then had an abstract made of Cook's title, and it showed certain defects, and numerous judgment, and trust deed liens on the land, amounting to something like $20,000.

One of the defects in the title to the 850 acre tract consisted of a tax title, claimed by C. F. and A. H. Cook, under a tax deed made to them, before L. B. Cook acquired title by deed from J. M. Laidley, trustee in bankruptcy, in a bankruptcy proceeding against John Cook, the former owner. Pending the bankruptcy proceeding, the land was sold for delinquent taxes, in the name of John Cook, and purchased by C. F. and A. H. Cook. L. B. Cook claims that, notwithstanding their tax title, he was induced by C. F. and A. H. Cook to purchase the same land, at the bankruptcy sale, that there was an agreement between them to share in the land. On the 6th of October, 1891, he conveyed to them, in severalty, the surface, reserving to himself the mineral of all kinds underlying the tract of 850 acres and a tract of 22 acres, and also reserving the ''timber sufficient for all mining purposes, said timber to consist of any timber that may now be growing or that may hereafter grow on said real estate, except the poplar, ash, cucumber and walnut.'' But C. F. and A. H. Cook did not then expressly release, by deed, their claim to the mineral and timber reserved by L. B. Cook. Why they would accept a deed from him, having the older title themselves, is not clear, unless, as L. B. Cook says, it was in pursuance of their agreement to become jointly interested in the land. It became necessary for L. B. Cook to clear his title of their claim.

The other principal objection to Cook's title was a recorded option he had given the Standard Realty Company of Huntington in 1908. After these defects were called to L. B. Cook's attention, early in 1910, he denied any right of C. F. and A. H. Cook in the mineral and timber sold to Thomas, and sought to obtain from them a release, without suit. He finally compromised with C. F. Cook, by agreeing to pay him the sum of $4,000, and took from him a release of his claim upon the mineral and timber embraced in the sale to Thomas. That deed bears date November 22, 1910, was acknowledged December 2, 1910, and recorded March 25, 1911. A vendor's lien was retained to secure the payment of the $4,000. And, on the 14th day of September, 1911, he obtained a release deed from A. H. Cook and wife, and J. M. Cook, in which C. F. Cook and wife also joined. This deed was acknowledged on the day of its date, and recorded October 3, 1911. The release

of the option held by the realty company was obtained in March, 1910, and recorded October 27, 1911. After obtaining the foregoing releases, Cook was in position to make substantial compliance with his contract, and so notified Thomas. True, the releases were not recorded until sometime thereafter; but that is not material, if Thomas had the five days written notice provided for in the contract. That he did have such notice is fully borne out by the record. As early as December 10, 1910, James H. Gilmore, attorney for Cook, wrote Thomas, that, so far as the claim of C. F. and A. H. Cook was concerned, the title was cleared, and requested him to let him know what he intended to do in the premises; and, on December 16, 1910, Thomas answered, admitting receipt of a letter from Messrs. Childers & Gorby, also attorneys for Cook, written as early as the 22nd of the previous November, advising him of the release by C. F. Cook. He says he wrote them on the 22nd of November, requesting a copy of the release, and had received no reply, and requests Gilmore to send him certified copies of the releases, so that he can have his attorney to examine them, and says, if he finds the title in good shape, he will then be ready to carry out his contract, "within a reasonable time". In their letter of November 22nd, Childers & Gorby advised him of the release of the tax title, and that L. B. Cook expected him to comply with his contract within a few days, else Cook would take steps, either to compel him to do so, or to cancel the contract. Again, on March 21, 1911, L. B. Cook and wife, through their attorney Gilmore, wrote Thomas they were ready to execute to any person whom he would designate, a deed with covenants of general warranty and against all encumbrances, in compliance with the contract, and would deposit it at the Citizens National Bank in Pineville, on the 29th of that month. Thomas did not reply to this letter, and gave no directions concerning the grantee to be named in the deed. He testified that he started to Pineville, on the 29th of March, and got as far as Lester, and 'phoned from there to Mr. Worrell, his attorney, and requested him to go to the bank and ascertain whether or not, the deed had been deposited, and says that, afterwards, Mr. Worrell wrote him the deed had not been filed. If he was acting in good faith, and was ready,

as he testifies, to comply with his contract, why did he not
go to L. B. Cook and tender him the cash payment, and
demand a deed? If he had been as eager to comply with his
contract, as he was to get it, he would have learned from
Cook himself, that his title was cleared up, although the re-
leases were not then recorded. On the 4th of May, 1911, Cook
again wrote Thomas, that he would execute to anyone he
might designate a deed in compliance with his contract, and
would deliver it at the same bank previously named, on the
13th day of May. He was also advised, that if he would
furnish copies of the courses and distances of the boundary
lines, ascertained by the recent survey, they would be in-
corporated in the deed. He did not reply to this notice, but
notwithstanding, Cook and wife, on the 12th of May, 1911,
made and acknowledged a deed for the land, according to the
description of it given in the contract of sale, and deposited
it in the bank. Again, if he was ready to comply with his
contract, and was acting in good faith, why did he not
furnish Cook with a copy of the calls from Beddow's survey
and report, and inform him to whom he desired the deed
made? Cook testified that he wrote Beddow, at least twice,
for a copy of his survey and plat, and also for his original
deeds he had turned over to him, by which to make the sur-
vey, and received no reply. In this he is borne out by Bed-
dow himself, who swore the reason he did not furnish Cook
with the information was, because Thomas had requested him
not to do so. Gilmore testified, that he caused L. B. Cook
and wife to execute and acknowledge the deed, and placed it
in the bank on the morning of May 13, 1911, where it re-
mained for several days, and that he notified Howard &
Worrell, who, as he had been advised by letter from Thomas,
were his counsel in the matter, that the deed was in bank for
inspection. Thomas swears he did not see the deed, and does
not think he saw a copy of it. But, in this, he must be mis-
taken, for he is contradicted by a letter from his attorneys,
Howard & Worrell, which he files as an exhibit with his
deposition. The letter is dated May 21, 1911, and purports
to be a reply to one from Thomas, received just before, and
imports that, instead of replying to Cook, or to his counsel,
on receipt of the notice that the deed would be ready for

delivery on the 13th, Thomas wrote his own counsel instead. Howard & Worrell, in their letter, written by Worrell, say they enclose a copy of the deed, and that it was not delivered at the bank, as the notice said it would be, and further say the deed was not sufficient, that nothing had been released on the land. They say furthermore: ''There is trouble about this deed. They have not complied with the contract of option, for they have released nothing. Gilmore told me so much the day he wrote the deed. This is one of Gilmore's foxy tricks to get us to sue Cook instead of Cook sueing you. Have you acknowledged receipt of Gilmore's letter? If you have not, do not, and it will be up to him to show that you have yet had notice of this deed. I suppose we will eventually have to sue him, but for the present it might be well for us to give him a counter notice that we had inspected his deed, and that it does not comply with the option, and that we expect to hold him to the contract, and we will be in the same position that he is in, or that we were both in at the beginning. Think over this last proposition and tell us what you think of it. I think it will be sufficient.''

This letter also tends very strongly to show that the real purpose was to procure delay in closing up the sale, that Thomas was playing for time, and trying to keep the land tied up with his contract, until he could make a profitable sale of it to someone else. It shows that he was expecting to be sued by Cook, and was trying to construct a defense to defeat him if possible. It indicates that he was not ready to comply, and still desired to make Cook believe he was ready. In his testimony, Thomas expressly admits that he was, at no time, personally able to buy the land, but claims he had other purchasers who were ready to take it off his hands, or to join with him in the purchase, whenever Cook was in a position to make a good title. He names certain persons who, he says, had agreed to purchase the land, and were able and ready to comply with Cook's terms of sale to him. But he produced no binding agreement with them to do so, and offered none of them as witnesses in his behalf. He exhibits an option to J. W. Heron, trustee, signed only by himself, dated November 23, 1909, agreeing to sell him the land at $50 an acre, provided he elected to take it in forty days, and pay,

in cash, one-third of the purchase price. He also produced another paper, not signed by anyone, proposing to organize a joint stock company, with a capital of $80,000, for the purpose of buying, developing, reselling and leasing the land, and mining coal and manufacturing coke thereon. It recites that L. B. Cook is the owner of the land, and that J. W. Heron, D. E. Mathews and H. T. Lovett are the owners of an option to buy the same at $50 an acre. According to the plan therein provided, Heron, Mathews and Lovett were to assign their option to the proposed company, in consideration of $12,000 of its capital stock. The paper is also a prospectus, giving the number of coal seams in the land, with a chemical analysis of each; a computation of the tonnage of coal, the location of the seams with reference to mining facilities; its accessibility to the railroad; and other matters of interest to prospective investors. It was prepared some time in 1910, the exact date not appearing, but it was evidently after Thomas had given the option to Heron, Mathews and Lovett, for that was given November 23, 1909, less than two months after Cook's sale to Thomas. The optionees are the parties to whom Thomas claims to have sold, and who, he says, were ready to take the land and comply with the terms of his purchase from Cook. But, we think, the fact that they were not ready to do so, is fully disclosed by this prospectus, showing the plan contemplated for raising the money. That plan was never perfected, the company was never formed and the money was not forthcoming, so far as the record discloses.

At the time Cook tendered Thomas the deed, to-wit, on the 13th of May, 1911, he was in a position to comply, substantially, with the contract on his part. True, there were then judgment and trust deed liens on his land, but it was understood between the parties that they were to be discharged with the purchase money. Cook was selling his land in order to get the money to pay off these liens; and Thomas knew he had a right to apply the purchase money to their payment. So likewise, with respect to the vendor's lien retained by C. F. Cook in his deed of release, the right to pay off that lien, at any time, was expressly given by the terms of the deed.

Being plaintiff in the cross suit for specific performance, Thomas is required to show, before he can obtain that relief,

that he was acting in good faith, and was ready and eager to perform the contract on his part. *Henking* v. *Anderson,* 34 W. Va. 709; *Clay* v. *Deskins,* 36 W. Va. 350; *Harrison* v. *Harrison,* 36 W. Va. 556; *Dyer* v. *Duffy,* 39 W. Va. 148; *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501; and *Wilkinson* v. *Poling,* 74 W. Va. 399, 82 S. E. 47. Specific performance is not a matter of right, but is purely an equitable remedy, resting in sound judicial discretion; and a party who does not show himself to have been ready, prompt and eager to comply with his contract, will be denied the relief. *Bowles* v. *Woodson,* 6 Grat. 78. Measured by that rule, Thomas' suit must fail. He was never, at any time, ready to make the cash payment, he says so himself. He was depending on making a sale of the land to others, who could comply with the terms of his contract, and failed. In his letter to Gilmore, written on the 16th of December, 1910, he virtually admits he was not then ready, because he therein says, if his attorney finds Cook's title in good shape, he will be ready to carry out his contract, ''within a reasonable time''. Five days was all the time he had under his agreement.

In view of Thomas' failure to prove a case entitling him to relief, it is unnecessary to consider the evidence, taken on the question of fraud in the procurement of the contract, as a defense to his suit. He has failed to prove a *prima facie* case.

The lower court decreed a cancellation of the contract, in compliance with the prayer of the original bill. This was error for which the decree must be reversed; the Big Huff Coal Company was not entitled to relief on its bill, and it can not obtain affirmative relief on its defense to the cross-bill. The court should have sustained the demurrer to the original bill, and have given plaintiff leave to amend, if it should so elect; and it should have dismissed Thomas' cross-bill. The decree appealed from will, therefore, be reversed and this court will enter a decree in accordance with this opinion, and will remand the cause. If the plaintiff in the original bill is not in position to amend its bill, or should decline to do so, when the cause is remanded, its bill also should be dismissed. Thomas, having substantially prevailed, is entitled to his costs in this court.

*Reversed and remanded.*