# CHARLESTON.

H. EDGERTON VANCE, *Individually, etc., et al.. v.*

SAMUEL W. HARPER

(No. 6737)

Submitted November 12, 1930.   Decided December 2, 1930.

748

*Howard & Howard* and *Frank W. Nesbitt,* and *Merritt Lane,* for appellants.

*J. B. Handlan, Carl O. Schmidt,* and *John J. Coniff,* for appellee.

WOODS, JUDGE:

This is a suit by H. Edgerton Vance, individually and as sole acting executor of the will of James N. Vance, deceased, J. Nelson Vance and William M. Vance, against Samual W. Harper, the latter being the husband of Lillie Edgerton Vance, who is a sister of the plaintiffs. Its purpose is to require the defendant, as an alleged trusted agent of James N. Vance, to account for profits coming into his hands as a result of a number of telephone consolidations in which he was interested, and to turn over such amounts as may be found due and owing to the estate of James N. Vance; also that a settlement between the children of James N. Vance and the defendant, bearing date July 17, 1915, be declared ineffective as a bar to plaintiff's claim. The allegations of the bill proceed on the theory that Vance placed the several amounts in the different telephone concerns with the expectation of reaping a profit therefrom. This the defendant denies. From a decree in favor of the defendant, the plaintiffs appeal.

The various telephone mergers in which defendant was interested began some years prior to the death of J. N. Vance, which occurred on June 26, 1913. Almost continuously since that date hard feelings have existed between the Vance brothers and their brother-in-law, Samuel W. Harper. This unfortunate situation seems to have been brought about by the discovery by the executor of a certain paper in decedent's wallet, as follows: "April 11, 1913. Mr. Harper said that the profit on the Inter-State Telephone Co. would be about $300,-000 1-3 belong to Mr. Huling and 2-3 belonging to me. Of the National about $1,000,000 would be profit when all cleaned up leaving the P. &. A. of Pittsburgh as velvet. (Signed) J. N. Vance." This paper was in the handwriting of J. N. Vance.

In 1915, after repeated efforts for a settlement, H. Edgerton Vance, J. Nelson Vance and William N. Vance, and their attorneys, Riley and Rogers, together with Harper, after five

weeks' negotiations, prepared a written settlement, which was signed by the three Vances, their sister (Mrs. Harper) and defendant. This settlement set out the fact that J. N. Vance, during his lifetime had paid into the telephone business, the following: Cash paid to the Pittsburgh & Allegheny Telephone Company, $259,000.00; Cash paid to the Inter-State Telephone Company, $125,000.00; Cash paid for National Telephone Corporation bonds, $21,250.00; Cash paid for National Telephone Corporation bonds to Wm. Flynn, et al., $252,267.00; Cash paid at the sale for the Inter-State Telephone Company, $292,000.00; making a total of $949,517.00. Then followed a recital of the amounts paid back to J. N. Vance during his lifetime, and to his executor, and an acknowledgment of the balance ($171,805.99) from defendant. This "being in full settlement by the undersigned of all claims and demands against S. W. Harper, W. C. Handlan and Cyrus Huling of all matters connected with or growing out of the telephone business." There was no matter held open for future determination. No question is raised but that the above sums were all that were advanced.

It appears from the record that the $259,000.00 and the $125,000.00 items, totalling $384,000.00, were paid out by Vance to replace moneys withdrawn by Harper from the Pittsburgh & Allegheny and the Inter-State Companies and used in other properties. Vance soon after equalized this advancement, which was made on account of his daughter, by paying like sums to each of his three sons. In 1911, seeing that he would get a portion of the money back from Harper— that it was not a total loss—Vance required his three sons to repay a certain portion received by them to their sister, Mrs. Harper. A truce seems to have prevailed until 1922. In that year the plaintiffs, as they say, got some idea that defendant had made large profits, that Mrs. Harper had received some bonds in the P. & A., and started an investigation. While the flame was again smothered for a while, this suit was instituted in 1926.

The claim of the plaintiffs, as we see it, must stand or fall on the existence or non-existence of a trust relationship between defendant and the decedent. Have the plaintiffs es-

tablished such a relationship? They would make much of the memorandum found in the decedent's wallet. In fact, it is the only thing in all the testimony approaching any confirmation of the contractual relations alleged in the bill. This was admitted on the theory that it had been shown to the defendant and had not been denied by him. Edgerton Vance, after stating that defendant did not deny it, was asked, "What did he do?" and replied, "I don't know. He did some talking about it. He didn't deny anything on there." In another place he said that defendant's remark was "All right, but there weren't no profits." Mr. George Rogers, attorney, said that defendant's statement, when the paper was presented was "that he did not know it was in existence, but that he thought it upheld his contention that as there were no profits there was nothing to account for." But did the defendant fail to deny the facts set up in the paper? Harper and his wife deny that there was any understanding whereby Vance was to receive profits from the several advances. Mrs. Harper states that her father specifically told her shortly before his death that whatever was made from the sale of the properties belonged to Sam (Harper). Huling, one of plaintiff's witnesses, swore that Mr. Vance told him repeatedly that he was not in the telephone enterprise for profit, that all he wanted was his money back. That such was the case is supported by a letter bearing date March 7, 1922, from Lawrence E. Sands, now deceased, to Harper, to the effect that Vance never expected profits from the advancements, a portion of which was admittedly made for the protection of his daughter. Sands had been a representative of J. N. Vance for many years, and was such at the time of the latter's death. Harper says that he did promise J. N. Vance 2-3 of the Inter-State profits and explains that this was with the concurrence of Handlan and was to apply on the $384,000.00, $125,000.00 of which went into the Inter-State Company. He also admitted giving Vance an estimate on the profit of the National Telephone Corporation. The chancellor, after showing the impossibility of reforming the memorandum into a contract, points out Harper's inability to contract away 2-3 of the profit, and the further fact that "no provision whatsoever for a division of the National Telephone Corporation profits" were made, "nor did it say to

whom the 'velvet' would belong.'' At no time during the years that Vance was showing any activity whatever in the telephone business did he ever say to any person that he had any contract with Mr. Harper of any kind for profit.

Is the paper found in the wallet, the testimony regarding it, and the transactions carried on by Handlan, Huling and Harper, sufficient to show that Vance expected, and was to receive, 2-3 of all profits coming into the hands of Harper? The settlement of 1915, as we see it, does not throw any light on plaintiff's case. It purports on its face to account for advancements made for benefit of Harper during Vance's lifetime. It makes no mention of the conditions claimed to exist by reason of the memorandum discovered in decedent's wallet. Riley sat in the conference which terminated in its execution. It is reasonably certain that he had been the trusted counsellor of the elder Vance during the latter's activities in the telephone matters and was cognizant of his relations thereto. Had Vance been asserting any rights to profits from Harper, he would have known it. It is therefore inconceivable that he would have agreed to such a settlement had Vance been entitled to such profits with no mention in the paper of that fact. And the three sons signed, notwithstanding the memorandum to the effect that there was to be a million dollars' profit out of the National, and that the P. & A. was to be velvet. They now seek to get out of the settlement on the ground that they were defrauded.

The fact that defendant Harper and Huling for some reason deemed sufficient to them, kept the profits secret, we do not think has sufficient bearing in this case to establish plaintiffs' case. It is shown in evidence that some time before the receipt (1912) was given, that Huling, at a dinner party, gave Mrs. Harper bonds in the P. & A. of denomination amounting to $600,000.00, with the remark: ''These may some day be of some value to you.'' Harper and his wife and Huling all testify to the same effect. Such bonds were later put into the Marshall Investment Company in payment of $100,000.00 stock in her name. The record does not disclose otherwise what was the true value of the bonds. This, the counsel for the plaintiffs argues, was merely an attempt on the part of Harper to cover up the fact that profits were derived by him. ''Why

the subterfuge?", exclaims the learned counsel in his brief. But we look in vain for the reason from the record. To give to this circumstance any value, we must first believe that there was a contract between Mr. Vance and Mr. Harper for the sharing of profits, before the presumption that such gift was for the purpose of covering up and defeating such contract, can be considered. Men of large affairs do not care to air out what profits they are making in any particular transaction. The fact that defendant at various times since the 1915 settlement sought, by advances of different sums of money, to patch up differences which continually flared up between the Vance brothers and himself because of his wife, while in a sense inexplicable, cannot be relied upon as establishing plaintiff's contention that James N. Vance was to have profits.

Finally, if Mr. Vance was to share in the profits, what interest did he have therein? What does the memorandum say? Could it be enforced as a contract, in law or equity? The record leaves the whole matter in the realm of speculation and conjecture. This is not enough. We are enjoined by our decisions that parol evidence to establish a trust must be clear and unquestionable to produce such result. *Armstrong v. Bailey*, 43 W. Va. 778. Such is the rule in all jurisdictions. 26 R. C. L. 1203; 39 Cyc. 633. The matter was a question of fact for the trial chancellor, and after a careful reading and study of the voluminous record, which at its best contains much hearsay, we cannot say that he was wrong in his finding. *Linger v. Watson*, 108 W. Va. 180, 150 S. E. 525; *Davis v. Davis Trust Co.*, 107 W. Va. 141, 147 S. E. 490; *Kincaid v. Evans*, 106 W. Va. 605, 146 S. E. 620; *McBee v. Deusenberry*, 99 W. Va. 176, 128 S. E. 378.

While it is apparent on the face of the settlement that interest was not exacted, we do not see that the plaintiffs have been misled. They were represented by counsel at the time; several weeks were taken up in arriving at an agreement. On the point of whether or not interest was discussed, General Riley would have been a valuable witness. In the absence of a showing of fraud, the question goes out under the statute of limitations.

The decree of the circuit court must therefore be affirmed.

*Affirmed.*