H. C. Zogg *et al. v.* Grover F. Hedges

(No. 9496)

Submitted February 1, 1944. Decided February 29, 1944.

Fox and KENNA, JUDGES, dissenting.

*Harper & Baker* and *S. P. Bell*, for appellant.
*Lively & Lively* and *A. G. Mathews*, for appellees.

Rose, President:

In a chancery cause in the Circuit Court of Roane County in which H. C. Zogg and others were plaintiffs and Grover F. Hedges was defendant, a decree was entered directing the defendant to transfer to the plaintiffs the one-eighth interest, standing in his name, in three oil and gas leases, covering land in that county. An appeal from this decree was awarded the defendant. The plaintiffs assign cross error on the ground that they should also have had a recovery of $3,000 claimed by them from the defendant.

The bill of complaint alleges that the defendant Hedges is a practicing lawyer with offices at Spencer, between whom and the plaintiff Lively a long and intimate friendship had existed; that in July, 1941, the defendant advised Lively that he had knowledge of a certain oil and gas property in Roane County which was for sale at the price of $35,000 and requested Lively to procure others to join with him and the defendant in forming an "association or partnership for its purchase and operation as a joint enterprise", toward which the defendant proposed to contribute one-eighth of the purchase price and to take a like interest in the property, and to charge for his services in connection with the transaction only the sum of $800 as commissions and for abstracting the title; that Lively transmitted the defendant's proposal to his co-plaintiffs who, with Lively, after examination of the property offered to join with the defendant in purchasing the same at $32,000 to which price the defendant pretended to procure the assent of the owner, still agreeing to take one-eighth of the property at one-eighth of its purchase price; that the plaintiffs or their representatives met with the defendant in his office in Spencer on the 18th day of July, 1941, turned over to him their checks aggregating $28,000 for their seven-eighths of the purchase price of $32,000 to which the defendant purported to add his own check of $4,000, after which he took all the checks to a bank in Spencer where the deed from the owner was

in escrow, delivered the checks to the bank and took up the deed; that the fact, unknown to the plaintiffs until after the acceptance of the deed but concealed from them by the defendant, was that he, the defendant, during all these negotiations had an option from O. H. Reed, the owner of certain oil and gas leases, to purchase the same at the price of $25,000, which was the whole amount paid to the owner; that the defendant paid nothing whatever for the interest conveyed to him by said deed and took and retained $3,000 of the amount which the plaintiffs had contributed for the payment of the property; and that the defendant thus by false representations on which the plaintiffs relied, has obtained for nothing one-eighth of said leases and $3,000 of the plaintiffs' money . The prayer of the bill is:

> "that a decree be entered herein cancelling the deed made by O. H. Reed and wife to plaintiff and to the defendant Grover F. Hedges, bearing date on the 17th day of July, 1941, as to the interest of said defendant therein, and that said deed be cancelled, set aside, annulled and held for naught in so far as the same grants and conveys unto the said Grover F. Hedges a one-eighth interest undivided, in the property therein conveyed, sold and assigned; that these plaintiffs may have a recovery against the said defendant by proper decree herein, for the sum of Three Thousand Dollars, taken by the defendant from the joint funds put up by plaintiffs for the purchase of said property, and that said defendant be required to account for the one-eighth of the oil and gas received by him from the production since the purchase of said properties; * * *."

This, therefore, is not a suit to set aside a contract for fraud, and to restore the plaintiffs to a former position. There is no pretense that the plaintiffs did not receive precisely what they intended to buy, nor what they got was not fully worth what they paid. They do not renounce their contract but affirm it and sue on it. Their claim is simply that they should have gotten more for

their money, or the same property for less money, by reason of matters advantageous to them which were either concealed or not disclosed, by the defendant while standing in a position of trust and confidence toward them. They maintain that the defendant, a partner with them, made a profit of $3,000 in cash and one-eighth of the purchased leases, which in good conscience and equity should be shared with, or turned over to, them. They plainly base their bill on the universal rule that partners must deal with each other openly and in the utmost good faith. This principle of common honesty covers not only transactions after the partnership is established but those taking place during negotiations toward the partnership. *Fouse* v. *Shelly,* 64 W. Va. 425, 63 S. E. 208; *Engeman* v. *Taylor,* 46 W. Va. 669, 33 S. E. 922. It controls as well in mining partnerships as in those of a general commercial character. *Kimberly* v. *Arms,* 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; *Wetzel* v. *Jones,* 75 W. Va. 271, 84 S. E. 951.

Ordinarily the remedy for false representation or fraud is by an action at law for fraud and deceit. *Wilt* v. *Crim,* 87 W. Va. 626, 105 S. E. 812; *Big Huff Coal Company* v. *Thomas,* 76 W. Va. 161, 85 S. E. 171; *Swarthmore Lumber Company* v. *Parks,* 72 W. Va. 625, 79 S. E. 723. But when it is charged that the fraud has resulted in a trust *ex maleficio* equity has jurisdiction. The bill plainly and clearly alleges facts, which, if proved, will create this character of trust. *Carleton Mining & Power Co.* v. *West Virginia Northern R. Co.,* 113 W. Va. 20, 166 S. E. 536. *Kersey* v. *Kersey,* 76 W. Va. 70, 85 S. E. 22. *State* v. *Phoenix Mutual Life Insurance Company,* 114 W. Va. 109, 170 S. E. 909.

But the prayer of the bill goes beyond the equitable deserts of the plaintiffs on their own showing. They would have the court say that, by reason of their having paid the whole of the price received by the seller, plus $3,000, they should have the whole property and a refund from the defendant of the excess. The court gave them the entire property, but allowed the defendant to retain the

$3,000 as profit from the transaction. How the plaintiffs' claim, or the court's decree can be sustained, we cannot see. The utmost showing to which the plaintiffs pretend can, at most, justify only a decree which would place them where they claim they should have stood if the defendant had dealt equitably with them. This would mean that they should have been required to pay for their purchase only seven-eighths of $25,000, or $21,875, instead of seven-eighths of $32,000, or $28,000. Thus a restitution of $6,125 would completely rectify their alleged wrong. Upon no possible theory which we can perceive can the plaintiffs appropriate to themselves, to the complete exclusion of the defendant, the entire property on which he held an option and which, they allege, they and he purchased jointly. For this reason alone there must be a reversal of the decree and a rejection of the cross-assignments of error.

The defendant by his answer says that he did contact the plaintiff Lively regarding the leases in question, stating their price at $35,200, and that through Lively the other plaintiffs came into the transaction; that the plaintiffs after inspection of the property agreed to pay $32,000 for the property after which at their pressing request he, the defendant, agreed to take one-eighth interest in the leases at $4,000; that his check for that amount, together with the checks of the plaintiffs for $28,000, were used to take up the deed which was lying in escrow, of which total sum Reed, the owner of the property, received only $25,000; and that his, the defendant's, profits in the deal consisted of the interest in the leases conveyed to him and $3,000 in cash, being the excess of the payment of the plaintiffs over what the seller received. But the defendant denies that he at any time offered or requested Lively and his associates, or any of them, to join with him in a partnership or association for the purchase of the property, saying that he at all times was asking them to buy, and that he always maintained the position of a seller toward them; that the plaintiffs knew that he held an op-

tion on the property and that the dealings between the plaintiffs and the defendant were "always at arms length". The defendant further denies that he ever told the plaintiffs or any of them that his profit on the transaction would be limited to $800 or any other sum.

It is, therefore, perfectly plain, from the pleadings alone, that the plaintiffs paid simply $28,000 for seven-eighths of the Reed leases; that Reed received therefrom only $25,000; that the defendant got out of the transaction as profits and without cost one-eighth of the leases, plus $3,000. Stated more simply, the defendant holding an option to buy the leases at $25,000, in practical effect, sold seven-eighths thereof to the plaintiffs for $28,000, thus obtaining one-eighth of the leases without cost and a cash profit of $3,000. There is nothing questionable about such a transaction unless the defendant occupied such a relation toward the plaintiffs as would require him to disclose and share his option with them, and from which equity will treat him as holding his interest in the leases and his cash profits in trust for them or for them and himself jointly.

Therefore, the first, and possibly the final, question for determination is whether the transaction between the plaintiffs and the defendant was such as to create a relation of trust and confidence on the part of the defendant toward the plaintiffs by which the latter became entitled in equity to share in the benefit of the defendant's option on the Reed leases. If this relation existed the plaintiffs had very different rights and remedies from those which might have subsisted if the parties dealt with each other as strangers.

To sustain such a trust relation by oral evidence, however, the proof must be clear and distinct. This requirement of proof prevails whether the trust or trust relation is express, resulting or constructive, and whether it relates to realty or personal property. In some jurisdictions it has been held expressly that oral trusts and trust relations cannot be established by a mere preponderance of evi-

dence. *Gillespie* v. *Gillespie*, 187 N. C. 40, 120 S. E. 822; *Edmundson* v. *Friedell*, 199 Ind. 582, 159 N. E. 428; *Cushing* v. *Hueston*, 53 Wash. 379, 102 P. 29; *Mead* v. *Robertson*, 131 Mo. App. 185, 110 S. W. 1095; *All* v. *Prillaman*, 200 S. C. 279, 20 S. E. 2d 741. This precise statement has never been enunciated in this jurisdiction but the language used by this Court in specifying the character of oral evidence required to establish trusts is significant. Examples are: "Clear and unquestionable" in *Armstrong* v. *Bailey*, 43 W. Va. 778, 28 S. E. 766; "full, clear and satisfactory" in *Gilbert Brothers & Company* v. *Lawrence Brothers*, 56 W. Va. 281, 49 S. E. 155; "clear, strong and unquestionable" in *Hudkins* v. *Crim*, 64 W. Va. 225, 61 S. E. 166; "strong, clear, and unquestionable" in *Spaulding* v. *Spaulding*, 87 W. Va. 326, 104 S. E. 604; and "clear and unquestionable" in *Vance* v. *Harper*, 109 W. Va. 747, 156 S. E. 118. A trust *ex maleficio*, as the one here claimed, grows out of fraud, and we have used like language in stating the fullness with which such fraud must be proved, as "clearly, distinctly and fully" in *Tokas* v. *Arnold Co.*, 122 W. Va. 613, 11 S. E. 2d 759; "clearly and distinctly" in *Atkinson* v. *Jones*, 110 W. Va. 463, 158 S. E. 650; "clearly and fully" in *National Fruit Product Co.* v. *Parks*, 108 W. Va. 321, 150 S. E. 749; "clearly" in *McDonald* v. *County Court of Logan County*, 94 W. Va. 773, 120 S. E. 891; "clearly and distinctly" in *Hunt* v. *Hunt*, 91 W. Va. 685, 114 S. E. 283; "clearly" in *Sansom* v. *Wolford*, 60 W. Va. 380, 55 S. E. 1020, and "strictly and clearly" in *Board of Trustees* v. *Blair*, 45 W. Va. 812, 32 S. E. 203.

While this emphatic language, so often reiterated, may not be, in all respects, equivalent to a requirement of more than a preponderance of evidence, it cannot be considered utterly meaningless. In the first point of the syllabus in *Hudkins* v. *Crim, supra*, we called this standard of evidence a "superior measure of proof". We see no reason for abandoning this characterization of the evidence required to sustain an oral trust or a trust *ex maleficio*. If we have not said that such evidence must be greater

in quantity, there can be no doubt that we have repeatedly held that it must be higher in quality — in clearness, fullness and persuasiveness. From this viewpoint the evidence herein must be measured.

The evidence on the question of this trust or trust relation is brief and simple. The testimony of Lively and Zogg supports the allegations of the bill, as to the creation and existence of the partnership or joint adventure. The defendant's testimony, with equal clarity, supports his answer, in the denial of these relations; and his secretary, who heard the defendant's proposals to Lively and Zogg, made by telephone in her presence, says that he only offered to sell and not to join in the purchase of, the Reed leases, and that he did not say that his profits would be limited to $800 or to any other sum.

The version of the controverted transaction pleaded and testified to by the defendant and his secretary, presents the very familiar situation of one holding an oil and gas lease or the control thereof, who sells a part of the same for more than the option price of the whole, retaining the residue, thus obtaining a part of the optioned property without cost, plus a cash profit. There is no fraud or inequity about such a transaction, if the parties deal with each other as strangers. The version of the plaintiffs bears a certain degree of improbability. The defendant was the holder of an option to buy these leases at $25,000. It clearly appears that they were worth very much more than this price. They were actually sold on the basis of a value of $32,000. Hence this option may be considered as being a property worth to the defendant at least $7,000. The plaintiffs assert that the defendant simply offered to them this valuable option for nothing; that he, holding and owning this contract of great value, voluntarily proposed to the plaintiffs, then legal strangers to him, that he would join them in buying these leases as if he held no option. This would have meant his giving for one-eighth interest in the leases, not only $4,000, but also his option worth apparently $7,000. It is, of course, en-

tirely possible that such a proposition was submitted by the defendant, but it would have been out of the ordinary, and hence requires clear proof.

The contention of the plaintiffs that the defendant's profit was to be limited to $800 rests solely upon the testimony of the plaintiff Lively. All he says is in answer to the question: "What did he say about the $800.00 commission?" Lively's reply was: "Not much, other than that all he was getting out of it was $800.00 and the interest that he wanted in it." This talk was by telephone and it is clearly denied by the defendant and by his secretary who heard the defendant's end of the conversation. On the other hand Zogg merely testified that "He (defendant) said he wanted to be frank with the people going into it with him, wanted them to know he was getting $800.00 commission, and he asked me if I thought that was fair. I told him I thought it was all right." There is nowhere in Zogg's testimony any statement that the defendant represented that his profits were to be limited to $800.00. On this point the two agents sent by Zogg to examine the lease also testified. Riggs says: "Before that time, on our way out to the lease, he said he was interested in the lease and he didn't care if we knew it that he was receiving $800.00 commission if he sold the lease." Cline says: "In the same conversation the commission figure of $800.00 was mentioned", and in reply to the question "Did he say that was all the profit he expected to get out of it?" over objection by defendant, answered: "Yes, the frankness of Mr. Hedges would indicate that that was all he expected to get." Thus Zogg and Riggs merely say that defendant stated that he was to receive $800 commission, while Cline merely concludes from the defendant's frankness that he was to receive this profit and no more. Lively's testimony therefore stands without substantial corroboration on this vital point.

As bearing upon the question of whether the defendant represented that his profit should be limited to $800 we cannot overlook certain expressions in the evidence of

Lively and Zogg. The defendant testified that on the day of closing the deal Lively had demanded a part of the commissions of $800 to which he, the defendant, had replied: "Bill, I am getting much more than that." Lively's only denial was that he did not "recall any such statement." Zogg testified that "possibly a week more or less" after getting the deed from Reed he was on the leases and met Mr. Reed and "asked him this very plain question. 'Mr. Reed, what did you get for the gas?'" Why the inquiry if Zogg did not understand, assume or suspect that Reed was to receive less than the purchasers paid? Can a court say, in view of this evidence, these two plaintiffs understood they were getting the leases at the seller's price?

Further, the testimony of the plaintiffs is that the defendant, in his dealings with them, fixed the price of the leases at $35,000. The plaintiff Lively testified that "Some time in July, 1941, prior to the 18th, he called me on the telephone and said, in substance, that he had a mighty good deal; that he had a property in which he wanted to associate me with him, and stated what it was. It was an oil property, with a production of about 1000 barrels a month and some gas; that is was a 'steal' at the price and I asked him what the price was, and he said around $35,000; * * *." Zogg testified that "Mr. Hedges said at that time it could be purchased at $35,000, of which he was prepared, willing and anxious to buy one-eighth with us, that is with Mr. Lively and I * * *."

These alleged statements of the defendant created no obligation on his part to procure the property for the plaintiffs at the lowest price possible. The proposal was to join in buying, not at the best price, but at a specified price, namely, $35,000. The holder of an option is not required to give those who join with him in buying the optioned property the advantage of his option. He can sell to them at such price as may be agreed upon. *Kilbourn v. Sunderland*, 130 U. S. 505, 9 S. Ct. 594, 32 L. Ed. 1005; *Saxby v. Southern Land Co.*, 109 Va. 196, 63 S. E. 423;

*Heckscher* v. *Blanton*, 111 Va. 648, 69 S. E. 1045; *Scott* v. *White,* 50 Or. 111, 91 P. 487; *Merriam* v. *Kenderdine Realty Co.,* 25 D. L. R. 375, 34 O. L. R. 563.

The plaintiffs argue that the court must have found that the evidence preponderated in their favor and that on conflicting evidence we cannot find otherwise. But the trial chancellor did not so find. It is expressly stated in his written opinion filed in the record that "It may well be said that the testimony was not far from an even balance" were it not for the failure of the defendant to produce in evidence the $4,000 check with which he claims to have paid his share of the $32,000, or the books of the bank or some official thereof, showing its clearance. But this incident can have no possible bearing on any question which we are considering. How can the clearing of this check cast any light on the question of the relation or contract between plaintiffs and the defendant? And of what importance is the matter of best or secondary evidence, when the fact to be proved by the evidence is fully admitted by all parties? Or, ultimately, of what significance is it whether the check was cleared or not cleared. After all it would have been a mere matter of bookkeeping. If cleared, it would have resulted in both a charge and a credit of $4,000 on his account, changing nothing. Defendant in no way denies that he received without cost one-eighth of the leases, plus $3,000 in cash, and that the latter came from the $28,000 paid by the plaintiffs. Why concern the court with the purely moot question of best or secondary evidence on that point?

If we concur fully in the chancellor's estimate of the weight of evidence, plaintiffs must still fail. They can have no relief on evenly balanced evidence. In *Greer* v. *O'Brien,* 36 W. Va. 277, 15 S. E. 74, we said that "So long as the scales are evenly balanced, the defendant against whom fraud is alleged must prevail." See *Clark* v. *Clark,* 139 Md. 38, 114 A. 722. In *LaFollette* v. *Croft,* 122 W. Va. 727, 14 S. E. 2d 917, we found the evidence in "stalemate"

and held that the presumption against fraud and favoring honesty should prevail.

A precisely similar question as to proof was involved in *LaFollette* v. *Croft, supra,* in which we acted upon the same general principle here announced. Croft undertook to establish that LaFollette stood in a relation of trust and confidence toward him, by reason of which La-Follette's concealment, or failure to disclose, his actual income from his oil and gas lease amounted to a fraud upon Croft. We denied relief for insufficient evidence, saying through Judge Maxwell: "Fraud is a blight which will afford basis for reformation or cancellation of any instrument it contaminates. But fraud involves a charge of grave seriousness, and can be sustained only on full proof. *Hunt* v. *Hunt,* 91 W. Va. 685, 114 S. E. 283. In vain do we look for that degree of proof in this case."

Our conclusion is that there is not sufficient evidence in this case to establish a trust in the property involved or a trust relation of the defendant toward the plaintiffs which would require him to account to the plaintiffs for any part of his profits; but that the defendant and the plaintiffs must be considered as having dealt with each other as strangers. Hence equity has no jurisdiction of the controversy.

We reverse the decree appealed from and dismiss the bill.

*Reversed.*

Fox, Judge, dissenting:

While I believe that the decree complained of is erroneous in certain respects, hereinafter noted, and should be reversed, and the cause remanded for the entry of such a decree as I believe the record calls for, I am not in accord with the ruling of the majority which denies to the plaintiffs any relief, and dismisses their suit.

In my opinion, the decision on one question of fact determines the final result in this suit. That question is: Were the plaintiffs and the defendant engaged in a joint

adventure from and after the date when the defendant first brought to the attention of the plaintiff, Lively, the matter of the purchase of the oil and gas property involved herein? If they then became so engaged, it was the duty and clear obligation of the defendant to freely and fully disclose to his co-adventurers every fact which might in any way influence their judgment; and any failure to do so operated as a legal or constructive fraud against those from whom such facts were withheld, regardless of whether there was or was not any actual intention to defraud. I understand the majority opinion to concede this point, but the majority members say that the evidence does not preponderate in favor of the plaintiffs on the question of fact presented, and, in effect, that the holding of the circuit court that it did, was plainly wrong.

I do not disagree with the majority holding that fraud, actual or constructive, must be established by clear and convincing evidence. The cases cited by the majority amply sustain that theory. But I am not in accord with the theory suggested, but not expressly approved, that something more than a preponderance of the evidence is required to establish fraud. The evidence considered by the court below is conflicting and on that conflict, and, we may assume, in full recognition of the rule above referred to, it found for the plaintiffs. In my opinion, we are required to sustain its decree under the well-established rule that the holding of a trial court, on a matter of fact, will not be disturbed unless plainly wrong; or, to put the proposition in another form, a finding, determining a question of fact, will not be reversed unless it clearly appears to be against the weight and preponderance of the evidence. Of course, if it so appears, such decree will be reversed. The rule applies to findings and decrees of courts of equity. These propositions are clearly sustained by numerous decisions of this Court cited in 1 Michie's Digest, Va. and W. Va. Reports, 504-5, Vol. 1, Perm. Supp. 168, and citation of particular cases is not considered necessary.

That there is clear and irreconcilable conflict in the testimony is beyond argument. The trial court stated in his written opinion that up to a certain point "the testimony was not far from an equal balance", and, of course, in that state of the record the defendant should have prevailed. But the court found other circumstances which, in its judgment, provided the necessary preponderance of the evidence in favor of the plaintiffs. That the trial court may have given undue weight to a particular circumstance is of little importance, if the case is one, where, from all the evidence, different courts might arrive at different conclusions.

I think it important that the rule that findings of trial courts, on matters of fact, be upheld in this Court, unless shown to be clearly wrong, should be followed. I consider the case at bar to be one where, if the decision of the trial court had been for the defendant, we would not be justified in reversing its decree; the decree of the trial court being in favor of the plaintiffs, I would apply the same rule. The case is, in my opinion, one which in a peculiar way, calls for the application of that rule. All of the litigants are men of high standing in their respective communities, and two of them are members of the bar of this Court. The controversy probably arose through honest misunderstandings, rather than any intention to defraud on the one hand, or to make an unjust demand on the other. On highly conflicting evidence an able and experienced Judge has rendered a decree, and I can see no reason for setting aside that decree.

But I do not think the record furnishes any basis for that part of the decree which deprives the defendant of his interest in the oil and gas property involved, but decrees to him the right to retain three thousand dollars as commissions. If there was a joint adventure, then it became the duty of the defendant to disclose to the plaintiffs the price at which the oil and gas property could be purchased. That price was twenty-five thousand dollars. Plaintiffs were advised that the defendant expected to

receive at least eight hundred dollars as commissions. Therefore, no injustice would be done plaintiffs if that sum be added to the purchase price, making the total cost of the property twenty-five thousand eight hundred dollars. The property was sold at thirty-two thousand dollars, and, aside from the eight hundred dollars commissions, the defendant's profit in the transaction was sixty-two hundred dollars. Under the finding and decree of the court below, that sum belonged to the joint adventure, and should have been paid into its treasury. When so paid the defendant would have been entitled to one-eighth thereof by reason of his interest in the joint adventure. By a decree to this effect, the same result will be reached as would have been reached had the defendant, in the first instance, fully disclosed the price at which the property involved was being purchased, and the transaction closed without profit to him other than the eight hundred dollars commissions. I would, therefore, reverse the decree of the circuit court and remand the cause for the entry of a decree in keeping with the principles outlined above.

I am authorized to state that Judge Kenna concurs in this dissent.